*State of Maryland v. Muriel Morrison*, No. 56, September Term 2019. Opinion by Hotten, J.

**SUFFICIENCY OF THE EVIDENCE—INVOLUNTARY MANSLAUGHTER—GROSS NEGLIGENCE**

The Court of Appeals held the evidence was not sufficient to support the involuntary manslaughter conviction, because co-sleeping by a caregiver with a child after consuming alcohol does not necessarily pose a substantial risk of harm. To the extent that the conduct creates a risk of harm, the attendant factors in conjunction with the associated risk did not support a finding of gross negligence.

**SUFFICIENCY OF THE EVIDENCE—RECKLESS ENDANGERMENT—SUBSTANTIAL RISK**

The Court of Appeals held that the evidence was not sufficient to support the conviction for reckless endangerment, because the conduct did not constitute a gross departure from that of a reasonably prudent person.

Circuit Court for Baltimore City
Case No. 113303023
Argued: March 5, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 56

September Term, 2019

_____

STATE OF MARYLAND

v.

MURIEL MORRISON

_____

Barbera, C.J.,
McDonald,
Watts,
Hotten,
Getty,
Booth,
Biran,

JJ.

_____

Opinion by Hotten, J., which Barbera,
C.J., Watts and Booth, JJ., join.
Concurring opinion by Watts, J., which
Barbera, C.J. and Booth, J., join.
McDonald, Getty and Biran, JJ., dissent.

_____

Filed: July 28, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

A jury in the Circuit Court for Baltimore City convicted Respondent, Muriel Morrison ("Ms. Morrison"), of involuntary manslaughter, reckless endangerment, and neglect of a minor, stemming from the death of her infant. The infant died as a result of "asphyxia from probable overlay"[1] after Ms. Morrison "co-slept"[2] with her four-month-old infant and her four-year-old daughter, following a virtual evening of drinking beer with friends via Facebook livestream. Ms. Morrison appealed her convictions to the Court of Special Appeals, which reversed in part.[3] The State timely appealed the decision of the

---

[1] Asphyxia, or blockage of the infant's airway, occurring "[w]hen another person shares the sleep surface with the infant and lays on or rolls on top of or against the infant while sleeping[.]" United States Department of Health and Human Services and National Institutes of Health, *Safe to Sleep: Common SIDS and SUID Terms and Definitions*, https://safetosleep.nichd.nih.gov/safesleepbasics/SIDS/Common (last visited July 17, 2020), archived at https://perma.cc/A7UH-NYZA.

[2] The term "co-sleeping" is most commonly used to describe a situation where a caregiver sleeps on the "same sleep surface as an infant[,]" but "it was used originally and more broadly to include both room-sharing and bed-sharing practices." Jeanine Young, PhD & Rebecca Shipstone, SIDS Sudden Infant and Early Childhood Death: The Past, the Present and the Future, *Shared Sleeping Surfaces and Dangerous Sleeping Environments*, https://www.ncbi.nlm.nih.gov/books/NBK513372/ (last visited July 17, 2020), archived at https://perma.cc/KU3Z-M3W7.
 The Court of Special Appeals and the parties adopted the use of "co-sleeping" to refer to an act that is more precisely described as "bed-sharing" or "the practice of sleeping in the same bed with one's child[.]" Bed-sharing, *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/bed-sharing (last visited July 17, 2020), archived at https://perma.cc/Y64Q-JG9Z.

[3] On appeal, Ms. Morrison also argued that there was insufficient evidence to support her conviction for neglect of a minor, and that any remaining convictions should be merged for sentencing purposes. The Court of Special Appeals declined to address this argument on preservation grounds. *Morrison v. State*, No. 1859, Sept. Term 2017, 2019 WL 3992051 (Md. App. Aug. 23 2019).

Court of Special Appeals. We granted *certiorari* to address the following question, which

we have slightly rephrased:

> Was the evidence sufficient to permit a rational trier of fact to find that [Ms. Morrison] was guilty of involuntary manslaughter and reckless endangerment in the death of her infant beyond a reasonable doubt?[4]

We answer that question in the negative and affirm the judgment of the Court of Special

Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.       The Underlying Incident

As reflected from the trial testimony, during September 2013, Ms. Morrison resided

in a three-story rowhouse in Baltimore City with her two youngest daughters, four-month-

old I.M. and her four-year-old sister ("the four-year-old").[5] Ms. Morrison awoke around

7:45 a.m. on September 2, 2013 and discovered that I.M. was unresponsive. The night

before, Ms. Morrison participated in a virtual "[M]oms' night out[]" with girlfriends and

---

[4] In its brief, the State phrased their question presented as follows:

> Was the evidence sufficient to permit a rational trier of fact to find that [Ms.] Morrison's conduct amounted to gross negligence where it showed that [Ms.] Morrison, after drinking herself into a self-described state of drunkenness and/or to the point of passing out, co-slept with an infant and another child in a full-sized bed and the infant died of 'asphyxiation from probable overlay'?

[5] To protect the privacy of the minor children involved, we do not identify them by name. *See In re J.R.*, 246 Md. App. 707, 717 n.1, 232 A.3d 324, 330 n.1 (2020).

2

consumed approximately four cups of beer.[6]  Approximately two and a half hours later, she fell asleep in the bed she shared with her two minor daughters.  At some point, the four-year-old awoke and observed Ms. Morrison sleeping on top of I.M.  The four-year-old unsuccessfully attempted to awaken Ms. Morrison by yelling and "thr[o]w[ing] stuff" at her.

Ms. Morrison later awoke to find the four-year-old playing on the floor next to the bed and I.M., closer to the edge of the bed, unconscious.  I.M.'s lips were blue and her body was cold to the touch.   The four-year-old told Ms. Morrison that she had "rolled on top of the baby" in her sleep.  Ms. Morrison unsuccessfully attempted to perform CPR and called 911 twice[7] before the paramedics and police arrived at her home.  I.M. was transported to Johns Hopkins Hospital (the "hospital") for treatment, but was pronounced dead upon arrival.  The medical examiner determined that the cause of death was "asphyxiation from probable overlay," as a result of Ms. Morrison sleeping on top of the infant.

Ms. Morrison was subsequently charged with involuntary manslaughter, first-degree assault, second-degree assault, and reckless endangerment, in connection with

---

[6] As explained in more detail below, she consumed the beers during a virtual "moms' night out" to celebrate the impending first day of school.  The other mothers were on Facebook, where they were toasting one another and celebrating virtually because they resided in different states.  Ms. Morrison later testified that she consumed about two cans of beer and some portion of a forty-ounce beer—a total of four cups.

[7] The first time Ms. Morrison hung up without providing her address to the dispatcher and had to call back a second time to do so.

I.M.'s death. A grand jury returned an indictment for all charges, except first-degree assault and added a charge for neglect of a minor.

## II. Legal Proceedings

### A. The Circuit Court Proceeding

At trial, the State called as its first witness, Jamel Jones ("Mr. Jones"), one of the paramedics who responded to the 911 call. Mr. Jones testified that the four-year-old advised him that her younger sister had stopped breathing. As Mr. Jones approached the top of the stairs, he observed Ms. Morrison carrying an unresponsive I.M. in her arms. When his efforts to resuscitate I.M. proved unsuccessful, he transported I.M. to the hospital, where she was later pronounced deceased.

Ms. Morrison's four-year-old daughter—who was seven years old at the time of trial—testified that she woke up and went downstairs to get some juice. When she returned to the bedroom, she observed her mother lying on top of I.M. The four-year-old alleged that she threw unidentified items at her mother and yelled, "Mom, you're on my baby sister," but Ms. Morrison remained in a "deep sleep." She testified that I.M. slept in the middle between her and her mother. She described her mother as laying on her left side, facing I.M.—a position that defense counsel regarded in closing argument as consistent with "care feeding[.]" That is "where the baby is just on the nipple…resting and relaxing."[8]

---

[8] The record does not reflect what the four-year-old was doing at this time. The following colloquy occurred to describe the way that Ms. Morrison laid in the bed, next to I.M.:

(continued . . .)

4

The four-year-old also testified that her father called on Ms. Morrison's cell phone while

the four-year-old attempted to awaken Ms. Morrison, but the ringing of the phone did not

---

(. . . continued)

Q: Now, when mommy was laying in the bed, can you tell the ladies and gentlemen of the jury if mommy ever moved, or if she just stayed still?

A: Oh, by being on top of my baby sister?

Q: Yes?

&ast;&ast;&ast;

A: She stayed still when she was on top of my baby sister. She just rolled over. She rolled on my baby sister and then almost went back to sleep.

&ast;&ast;&ast;

Q: Now, when your mommy was in the bed, before she rolled over, can you describe how she was laying in the bed?

A: [S]he was like this. He[r] hair was—her hair was right here. And then she was right here.

Q: [W]as your mommy laying on her back, or was she laying on her side?

A: Her side…[t]his side.

&ast;&ast;&ast;

Q: I can't see you. Which one are you pointing to?

A: This end.

Q: Okay. On her left side?

A: Yeah.

&ast;&ast;&ast;

Q: --what part of mommy's body touched [I.M.]?

A: Only this side of laying on her—no—no, this side laying on her actually. This side was laying on her, and her face was turned this way actually.

Q: So [,] her left breast?

A: That's what I remember.

5

awaken her. She further advised that I.M. was crying when Ms. Morrison laid on top of her, but she was not making any noise when the phone rang. Additionally, the four-year-old indicated that her mother appeared to have "woke[n] up out of her deep, deep sleep[,]" only briefly, after the phone call ended, but Ms. Morrison continued laying on I.M. and purportedly told the four-year-old that I.M. was okay before going back to sleep. The four-year-old also testified that she again tried to awaken Ms. Morrison, but was "too tired" and fell back asleep.

Sergeant Laron Wilson ("Sgt. Wilson"), the police officer who responded to the 911 call, testified that he received a call for a "child non-breather" around 8:37 a.m. on September 2, 2013. According to Sgt. Wilson, the paramedics had already taken I.M. to the hospital, but Ms. Morrison remained upstairs, where she sat on the edge of the bed, staring blankly. Sgt. Wilson asked Ms. Morrison if she was alright, and Ms. Morrison responded, "No. I killed my baby." She further stated: "I got drunk and killed my baby." Sgt. Wilson did not recall observing any behavior consistent with being under the influence of alcohol.

Latonya Townsend ("Ms. Townsend"), a licensed clinical social worker in the Pediatric Emergency Department at the hospital, testified regarding her interview of Ms. Morrison. According to Ms. Townsend, Ms. Morrison informed her that she drank "a few beers" the night before, after putting the children to bed. Ms. Townsend also recalled Ms. Morrison telling her that she had not consumed alcohol in quite some time prior to that evening. She also informed Ms. Townsend that when she woke up the next morning, she noticed that I.M.'s lips were blue and her body was cold. In addition, Ms. Townsend

6

testified that Ms. Morrison told her she was not sure what happened to I.M. and that Ms. Townsend would have to talk to her four-year-old.

Detective Jonathan Jones ("Det. Jones"), a homicide detective with the Baltimore City Police Department ("BPD"), was also called as a witness.[9] He testified that at the hospital, Ms. Morrison told him

> she had laid her children … her baby down in the bed with her four-year-old. Then she went on to begin drinking between that---she laid her children down between … 10 p.m. and 12 a.m., and then she began to drink. She doesn't know what happened after that. She woke up, and … the baby was unresponsive.

Additionally, the State introduced recorded statements that Ms. Morrison made to Det. Jones and Sgt. Richard Purtell at the police station after being advised of her *Miranda* rights.[10] In her recorded statement to the police, Ms. Morrison advised that she did not know what happened, that she had been "drinking a 40[11] like for … maybe an hour" earlier that evening, and that her four-year-old told her that she "rolled over" on I.M. Ms. Morrison recalled changing I.M.'s diaper around 2:30 a.m. She also stated that she drank

---

[9] During a pre-trial suppression hearing, Ms. Morrison moved to suppress the statements she made to Det. Jones. The trial court denied the motion to suppress and the videotape of her interview was played for the jury.

[10] *See Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966) (holding that an individual who is subject to a custodial interrogation, must be informed that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires[]").

[11] A "40" is a colloquial term for a forty-ounce bottle of malt liquor.

more than half of the 40-ounce.[12]   Det. Jones later transferred Ms. Morrison to Mercy Hospital for a blood alcohol concentration test.  However, the collected blood sample was not tested because the "window of opportunity to … accurately test the blood for alcohol had already gone through the window."[13]  Det. Jones also testified that he never detected the smell of alcohol on her breath or person.[14]

Next, the State introduced videotaped deposition testimony from the medical examiner, Dr. Ana Rubio ("Dr. Rubio").[15]  Although Dr. Rubio was unable to conclusively determine the infant's cause of death, Dr. Rubio opined that it was likely caused by "asphyxiation from overlay[,]" because the police investigative report reflected that I.M. was found unconscious under her mother[16] and the autopsy did not reveal the presence of any traumatic injuries or "natural disease processes[.]"  Regarding the manner of death, Dr. Rubio determined that I.M.'s death was accidental.  When asked about other potential

---

[12] Her trial testimony revealed that she had two 12-ounce cans of beer and a little over half of a 40-ounce bottle of Private Stock malt liquor the night before I.M. died.

[13] Hours had elapsed between the time Ms. Morrison advised the officers she drank alcohol and the time of the interview.  Det. Jones was informed by the Department that any alcohol that may have been in her system had dissipated.

[14] Det. Jones testified that he did not observe any of the typical signs of intoxication, including slurred speech, inability to comprehend instructions, or follow through with menial tasks, and that he did not administer field sobriety tests.

[15] Videotaped deposition testimony was taken in lieu of live testimony because Dr. Rubio retired before trial and was subsequently unavailable for the scheduled trial date.

[16] I.M. was not found under her mother.

causes of death, such as Sudden Infant Death Syndrome[17] ("SIDS"), Dr. Rubio testified that she was unable to either identify or rule out SIDS as the cause of death, since the possibility of asphyxiation is enhanced when the infant is sleeping with others.

At the close of the State's case, Ms. Morrison moved for judgment of acquittal, but the motion was denied.[18] Following the denial of her motion, Ms. Morrison was called as the sole witness for the defense. She testified that during the day on September 1, 2013, she and her daughters had a "tire out day, which is a day [she] spen[t][] doing activities all day[,] instead of keeping them in the house." She further testified that, later that evening,

---

[17] According to the Center for Disease Control ("CDC"), "[s]udden unexpected infant death ("SUID") is a term used to describe the sudden and unexpected death of a baby less than 1 year old[,] in which the cause was not obvious before investigation." Centers for Disease Control and Prevention, *Sudden Unexpected Infant Death & Sudden Infant Death Syndrome*, https://www.cdc.gov/sids/about/index.htm (last visited July 17, 2020), archived at https://perma.cc/4SQB-XX7G.

SUIDs include "sudden infant death syndrome (SIDS), accidental suffocation in a sleeping environment, and other deaths from unknown causes." *Id*. The Maryland Office of the Chief Medical Examiner defines SUID as "…the sudden death of an infant less than one year of age that cannot be explained after a thorough investigation is conducted, including a complete autopsy, examination of the death scene, and a review of the clinical history. All potentially non-natural causes of death cannot reasonably be excluded by the investigation and/or there is an issue of concern; for example[,] an unsafe sleeping environment or other environmental concerns, previous SIDS in the immediate family, healed unexplained injuries, parental substance abuse etc." Maryland State Child Fatality Review Team, 2018 Legislative Report, Health Gen. Art., § 5-704(b)(12), https://phpa.health.maryland.gov/documents/Health-General-Article-5-704(b)(12)-Maryland-State-Child-Fatality-Review-Team-2018-Annual-Legislative-Report.pdf (last visited July 17, 2020), archived at https://perma.cc/UQA2-8K56. Some cases of SUID fall under the subcategory of SIDs. "SIDS is a diagnosis of exclusion, assigned only when all known and possible causes of death have been ruled out." *Id*. at 13.

[18] During the oral motion for judgment of acquittal, defense counsel did not mention the neglect of a minor charge.

9

she was on her porch drinking, while participating in "a [virtual] mom['s] night out" with friends to celebrate the upcoming school year. Ms. Morrison put the four-year-old to bed to watch a movie sometime after 10 p.m. She stayed on the porch rocking I.M. until I.M. fell asleep, then put I.M. in the bed with the four-year-old, and returned to the porch. A neighbor offered Ms. Morrison one 12-ounce can of beer, and she later "sent for" another 12-ounce can and a "40." Ms. Morrison recalled having about four cups of beer that evening. She waited until 2:30 a.m. for the children's father to arrive, and when he failed to do so, she went inside. Thereafter, Ms. Morrison was able to continue with her usual routine of "pumping"[19] her breastmilk, changing I.M.'s diaper, locking the doors, and turning the television channel to PBS, before getting into bed with her daughters and falling asleep.

She recalled that the four-year-old awakened and told her that the children's father was on the phone, but by the time Ms. Morrison picked up the phone, he was no longer on the line. Ms. Morrison testified that the four-year-old then went to the bathroom and when she returned, Ms. Morrison pretended to sleep and placed her arm over I.M. so that the four-year-old would also fall back asleep. Ms. Morrison testified that she awoke naturally around 7:45 a.m. and observed that I.M. appeared "listless" at the end of the bed. She also

---

[19] "Pumping" refers to the act of expressing breast milk into a baby bottle. Centers for Disease Control and Prevention, *Nutrition: Pumping Breast Milk*, https://www.cdc.gov/nutrition/infantandtoddlernutrition/breastfeeding/pumping-breast-milk.html (last visited July 17, 2020), archived at https://perma.cc/43SF-C982.

10

recounted telling Sgt. Wilson, "No matter what, it's my fault. I couldn't save her[,]" after the paramedics rushed I.M. to the hospital.

At trial, an issue arose regarding the risks of parents sleeping in same bed with their children. The State argued that Ms. Morrison was given a "Pack 'n Play" for I.M. and informed of the importance of having a safe sleeping environment before I.M. was discharged from the hospital, but she chose to share a bed with I.M. despite the risk. Ms. Morrison testified that she did not use the "Pack 'n Play" that the hospital provided to her because "critters"—mice and ants—would crawl inside, and she did not want them in the "Pack 'n Play" with I.M.[20] Regarding the sleeping arrangement, Ms. Morrison also testified that she shared a bed with her mother as a child, her mother had done the same with her grandmother, and that she had engaged in the practice with each of her other children, as did many of the other mothers she knew. According to Ms. Morrison, caregivers sleeping in the same bed with their children was prevalent in her family and community. She recalled that hospital staff briefly discussed sleep safety with her when I.M. was born, but no one detailed the risks associated with co-sleeping. The prosecution argued that her decision to sleep in the same bed with her four-month-old infant after a night of drinking was "extremely reckless" and "creat[ed] a substantial harm" to her now

---

[20] At oral argument before this Court, the State regarded the sleeping arrangement as a distraction that was never the heart of the State's argument regarding the recklessness of Ms. Morrison's conduct. But, much of the prosecutor's argument in the proceedings below relied heavily upon whether Ms. Morrison should have been aware of dangers specific to sharing a bed with her infant, after consuming alcohol. The allegations concerning the sleeping arrangement are inextricably linked to the argument that Ms. Morrison was reckless and grossly negligent.

11

deceased child. At the close of all of the evidence, Ms. Morrison renewed her motion for judgment of acquittal, but the motion was again denied.

At the conclusion of the three-day trial, the jury returned a verdict for the State, convicting Ms. Morrison of the charges of reckless endangerment, neglect of a minor, and involuntary manslaughter. She was sentenced to a total of twenty years with all suspended—ten years for involuntary manslaughter to be served consecutive to a five-year term for reckless endangerment and a five-year term for neglect of a minor—followed by the imposition of a five-year period of supervised probation.

**B. Opinion of the Court of Special Appeals**

In noting her timely appeal to the Court of Special Appeals, Ms. Morrison argued that (1) the evidence was insufficient to support her convictions for involuntary manslaughter, reckless endangerment and neglect of a minor, and (2) any remaining convictions should merge for sentencing purposes. *Morrison*, 2019 WL 3992051 at *1. The Court of Special Appeals agreed that the evidence was insufficient to support Ms. Morrison's convictions for involuntary manslaughter and reckless endangerment, but did not conclude Ms. Morrison had preserved her argument regarding neglect of a minor. *Id*.

Regarding the sufficiency issue, the Court of Special Appeals held that Ms. Morrison's conduct was insufficient to support a finding of "gross negligence," which was required for the involuntary manslaughter conviction. *Id*. at *5. The court reasoned that Maryland appellate courts had not addressed the question of gross negligence as it pertains to the sleeping arrangement between a mother and her children. *Id*. The court specifically distinguished cases from other jurisdictions, observing that "[u]nlike the defendant in *State*

12

*v. Merrill*, 269 P.3d 196 (Utah Ct. App. 2012), Ms. Morrison has never had a child die from co-sleeping, and there was no suggestion that she was aware that co-sleeping could be deadly, even if risky." *Id.*

The Court of Special Appeals also concluded that there was no evidence that Ms. Morrison had a history of alcoholism like the defendant in *Bohannon v. State*, 230 Ga. App. 829, 498 S.E.2d 316 (Ga. Ct. App. 1998). *Id.* The court observed that, "Ms. Morrison drank beer and fell deeply asleep, but there was no reason on this record for her to believe that her drinking or co-sleeping, individually or in combination, posed a deadly threat to her child." *Id.* Although Ms. Morrison may have displayed poor judgment by sleeping in the same bed as I.M., following her consumption of alcohol, the court did not determine that her negligence rose to the level of "wanton and reckless disregard for human life[]" that is required to sustain a conviction for involuntary manslaughter. *Id.*

Regarding the reckless endangerment charge, the Court of Special Appeals held that the evidence was insufficient because in "[v]iewing the evidence in the light most favorable to the [prosecution]," the evidence could not support the conviction beyond a reasonable doubt. *Id.* at *6. According to the court, "there was no evidence either that she was intoxicated when she co-slept when her infant daughter, or that imbibing…beer posed a substantial risk to [I.M.]'s continued health." *Id.* Similar to the charge for involuntary manslaughter, the Court of Special Appeals found that the State fell short of establishing that Ms. Morrison acted with "conscious disregard[,]" or "wanton indifference" to the possibility that her actions would place I.M. in harm's way. *Id.*

13

# DISCUSSION

## I. Standard of Review

The sufficiency of the evidence is viewed in the light most favorable to the prosecution. *Corbin v. State*, 428 Md. 488, 514 52 A.3d 946, 961 (2012) (internal citations omitted). "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. State*, 415 Md. 174, 184, 999 A.2d 986, 991 (2010) (emphasis in original). The purpose of our review is not to engage in a "review of the record that would amount to, in essence, a retrial of the case." *Titus v. State*, 423 Md. 548, 557, 32 A.3d 44, 49–50 (2011). As such, the appellate court does not "re-weigh" the credibility of witnesses or attempt to resolve any conflicts in the evidence. *Fuentes v. State*, 454 Md. 296, 307–08, 164 A.3d 265, 272 (2017).

We do, however, assess "whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged[.]" *White v. State*, 363 Md. 150, 162, 767 A.2d 855, 862 (2001) (internal citations omitted). Although circumstantial evidence alone is sufficient to support a conviction, "the inferences . . . must rest on more than mere speculation or conjecture." *Smith*, 415 Md. at 185, 999 A.2d at 992. Those inferences must "afford the basis for an inference of guilt beyond a reasonable doubt." *Id.* (internal citations omitted).

## II. Parties' Contentions

The State argues that the evidence was sufficient to permit a rational trier of fact to find that Ms. Morrison's conduct amounted to gross negligence. According to the State, Ms. Morrison engaged in a practice—co-sleeping—that had been proven to be dangerous and, in addition to sharing a bed with her daughters, she drank enough alcohol to effectively "pass out." The State contends that this alone was sufficient for a finding of gross negligence:

> [Her] admission that she was drunk when she lay down in bed with I.[M.], that she then fell asleep, that she did not know and could not remember what happened, that she did not wake up when the phone rang, and that [four-year old-daughter] could not wake [Ms.] Morrison by "thr[o]w[ing] stuff" at her, is the kind of evidence that this Court has recognized supports a finding on gross negligence.

The State argues that the Court of Special Appeals focused on whether Ms. Morrison was aware of the risks associated with the sleeping arrangement, instead of applying the reasonable person standard applicable to gross negligence cases. According to the State, Ms. Morrison's "awareness" of those risks does not absolve her of wrongdoing where the standard is that of an objectively reasonable person. The State did not explicitly address the merits of the reckless endangerment charge, stating only that "[a] conviction for reckless endangerment also requires proof of the defendant's gross negligence."

Ms. Morrison argues that the Court of Special Appeals did not err because a reasonable trier of fact could not find sufficient evidence that Ms. Morrison acted with willful or wanton disregard for human life, or recklessly engaged in behavior that was substantially likely to cause death or serious bodily harm. Comparing the case at bar to

15

*Hall v. State*,[21] a criminal child neglect case, Ms. Morrison avers that her actions did not "objectively give rise to a high degree of risk to a child." 448 Md. 318, 139 A.3d 936 (2016). In her brief, Ms. Morrison distinguished *Cornell v. State*, 159 Fla. 687, 32 So.2d 610 (Fla. 1947), in which an infant was smothered to death after her grandmother became severely intoxicated, contending that the defendant's actions in that case were far more egregious than Ms. Morrison's. Ms. Morrison maintained that sharing a bed with her children was not inherently risky and that she was unaware that co-sleeping after drinking beer posed a high degree of risk to I.M.'s life. Additionally, Ms. Morrison asserts that "it is inconceivable that more than half of American mothers would choose to engage in behavior that posed an actual, substantial risk of death or serious injury to their children."[22]

---

[21] [Ms. Morrison] argues that *Hall* is instructive on the question of whether her conduct created a substantial risk of death or physical injury to I.M. In *Hall*, the defendant left her three-year-old-son in the care of his fourteen-year-old sister, where the son had a history of behavioral issues and leaving the house unaccompanied. *Hall*, 448 Md. at 321, 139 A.3d at 938. After the defendant agreed with social workers that she would not leave her son under the supervision of the fourteen-year-old, she allowed the fourteen-year-old to care for her son overnight. *Id*. at 323, 139 A.3d at 939. The son subsequently left the home and was discovered in a busy intersection just after 2:00 am. *Id*. at 325, 139 A.3d at 940. Ms. Hall was convicted of criminal child neglect. *Id*. at 321, 139 A.3d at 937; *see* Crim. Law § 3-602.1. This Court reversed the Court of Special Appeals and found that the evidence presented at trial did not support such a finding. *Id*. at 336–37, 139 A.3d at 947.

Criminal child neglect requires a showing of "substantial risk" of "physical harm" or "mental injury." *See* Crim. Law § 3-602.1. Whereas, involuntary manslaughter and reckless endangerment require a showing that the conduct created a substantial risk of death or serious physical injury.

[22] The Women's Law Center of Maryland ("WLC") submitted an amicus brief in support of Ms. Morrison. In its brief, the WLC characterized the State's position as creating a "co-sleeping while intoxicated" felony. The WLC suggests that, because criminal liability relies on the presumption that everyone knows the law, creating such a

(continued . . . )

## III. Sufficiency of the Evidence

### A. The Court of Special Appeals correctly held that the evidence was insufficient to sustain the conviction for involuntary manslaughter based on gross negligence.

Evidence is legally sufficient if any rational jury could find "the essential elements of the crime beyond a reasonable doubt." *State v. Coleman*, 423 Md. 666, 672, 33 A.3d 468, 471 (2011) (internal citations omitted). As such, we begin our analysis with the essential elements of the underlying crime. Neither the parties nor the Court of Special Appeals addressed whether there was sufficient evidence of actual and legal causation, and we need not address the issue *sua sponte*. Therefore, our review is limited to whether any reasonable jury could have found that Ms. Morrison's conduct was grossly negligent.

1. The Gross Negligence Involuntary Manslaughter Standard.

Common law involuntary manslaughter is generally defined as an "unintentional killing of a human being, irrespective of malice."[23] *State v. Thomas*, 464 Md. 133, 152, 211 A.3d 274, 285 (2019) (citing *State v. Albrecht*, 336 Md. 475, 499, 649 A.2d 336

---

(. . . continued)
felony would require all mothers to know each and every risk associated with raising children—including co-sleeping. The Center highlights the racial, socioeconomic, and gender-based biases underlying judgments regarding co-sleeping. Finally, the WLC contends that criminal liability for co-sleeping does not advance the goals of the criminal justice system—punishment, deterrence and rehabilitation—because Ms. Morrison is a grieving mother "who needs not be convicted of a felony to punish her," and such a conviction would neither rehabilitate her nor deter others from engaging in similar behavior.

[23] In Maryland, involuntary manslaughter is a common law felony. The punishment for involuntary manslaughter is codified in Md. Code, Criminal Law Article ("Crim. Law") § 2-207.

(1994)). To sustain a conviction for involuntary manslaughter, the prosecution must prove that the killing was committed in one of three ways: "(1) by doing some unlawful act endangering life but which does not amount to a felony[;] or (2) in negligently doing some act lawful in itself[;] or (3) by the negligent omission to perform a legal duty." *Corbin*, 428 Md. at 513 n.14, 52 A.3d at 961 n.14 (citing *Albrecht*, 336 Md. at 449, 649 A.2d at 347). For the latter two variations of involuntary manslaughter, "the negligence [must] be criminally culpable." *Thomas*, 464 Md. at 152, 211 A.3d at 285 (internal citations omitted). Negligence is criminally culpable if it rises to the level of wanton and reckless conduct—i.e., gross negligence. *See Mills v. State,* 13 Md. App. 196, 200, 282 A.2d 147, 200 (1971) ("[T]he negligence [must] be criminally culpable[.]"); *Albrecht*, 336 Md. at 499, 649 A.2d at 347–48 ("[W]here the charge of involuntary manslaughter is predicated upon the allegation that the defendant committed a lawful act in a negligent manner, a conviction of manslaughter will not lie on a showing of simple negligence . . . but must rather be predicated upon that degree of *aggravated* negligence which is termed 'gross negligence.'" (emphasis added)).

Depending on the circumstances presented, there is often a fine line of distinction between simple negligence and gross negligence. This Court has long recognized that "[t]here are degrees of negligence in the sense that some acts evidence a greater degree of carelessness and recklessness than do other acts which may still be classed as negligent." *State, Use of Abell v. W. Maryland R. Co.*, 63 Md. 433, 444 (1885). In *Stracke v. Butler*, 465 Md. 407, 214 A.3d 561 (2019)—a civil case addressing gross negligence—we expounded on that principle, noting that "[i]ssues involving gross negligence are often

18

more troublesome than those involving malice because a fine line exists between allegations of [simple] negligence and gross negligence." *Id*. at 420, 214 A.2d at 568 (citing *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007)). "Ordinary, simple negligence is 'any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against unreasonable risk of harm.'" *Id*. Conversely, conduct which is sufficient for a finding of gross negligence must establish that the accused "had a wanton or reckless disregard for human life." *Thomas*, 464 Md. at 153, 211 A.3d at 285. "Only conduct that is of extraordinary or outrageous character will be sufficient to imply this state of mind." *State v. Kramer*, 318 Md. 576, 590, 569 A.2d 674, 681 (1990).

In *Pagotto v. State*, 127 Md. App. 271, 279, 732 A.2d 920, 925 (1999), *aff'd*, 361 Md. 528, 762 A.2d 97 (2000), Judge Charles E. Moylan, Jr. similarly observed the varying degrees of negligence:

> In a case charging involuntary manslaughter of the gross negligence variety… the State will not be permitted to take its case to the jury simply by proving a *prima facie* case of ordinary negligence. It must meet an additional and higher burden of production by showing such gross negligence, above and beyond mere civil[,] [simple] negligence, as to evidence "a wanton or reckless disregard for human life. . . . "

In accordance with the elements of involuntary manslaughter based on gross negligence, the trial court instructed the jury that the State had the burden of proving that Ms. Morrison "acted in a grossly negligent manner and that this grossly negligent conduct caused [I.M.'s] death." The trial court also instructed the jury that grossly negligent means "the defendant, while aware of the risk, acted in a manner that created a high degree of risk

19

to, and showed a reckless disregard for, human life." *See Maryland Criminal Pattern Jury Instructions* 4:17.9.[24]  The *mens rea* for gross negligence is established by asking "whether the accused's conduct, 'under the circumstances, amounted to a disregard of the consequences which might ensue and indifference to the rights of others[.]'" *Albrecht,* 336 Md. at 500, 649 A.2d at 348 (internal quotations omitted).  In *Mills*, Judge Joseph Murphy, then Chief Judge of the Court of Special Appeals, further explained the requisite *mens rea* for gross negligence involuntary manslaughter:

> It is well settled in this State that where a charge of involuntary manslaughter is predicated on negligently doing some act lawful in itself, *the negligence necessary to support a conviction must be gross or criminal, viz., such as manifests a wanton or reckless disregard of human life*.  A causal connection between such gross negligence and death must exist to support a conviction, although it is not essential that the ultimate harm which resulted was foreseen or intended.

---

[24] Maryland Criminal Pattern Jury Instruction 4:17.9 provides, in pertinent part:

INVOLUNTARY MANSLAUGHTER--GROSSLY NEGLIGENT ACT

The defendant is charged with the crime of involuntary manslaughter.  In order to convict the defendant of involuntary manslaughter, the State must prove:

(1) that the defendant acted in a grossly negligent manner; and

(2) that this grossly negligent conduct caused the death of (name).
"Grossly negligent" means that the defendant, while aware of the risk, acted in a manner that created a high degree of risk to, and showed a reckless disregard for, human life.

[If defendant was unaware of the risk due to self-induced intoxication, that unawareness is not a defense.]

20

*Mills,* 13 Md. App. at 199–200, 282 A.2d at 149 (citations omitted) (emphasis added). In such cases, "[t]he act must manifest such a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of indifference to the consequences." *Thomas*, 464 Md. at 153, 211 A.3d at 286.

Whether conduct rises to the level of gross negligence is fact-specific. "[T]here is no scientific test or quantifiable probability of death that converts ordinary negligence to criminal gross negligence." *Id*. at 159, 211 A.3d at 289. We have never addressed gross negligence within the context of an infant sleeping in the same bed with a parent. Until our most recent decision distinguishing criminal culpability, i.e., gross negligence, from ordinary negligence, *State v. Thomas*, Maryland case law had only addressed gross negligence involuntary manslaughter and the degree of negligence necessary to find a defendant criminally culpable, within the limited contexts of "automobiles, police officers, failure to perform a duty, and weapons." 464 Md. at 154, 211 A.2d at 286; *see, e.g., Duren v. State*, 203 Md. 584, 102 A.2d 277 (1954) (finding sufficient evidence of gross negligence based on the environment in which the defendant was speeding); *Johnson v. State*, 213 Md. 527, 132 A.2d 853 (1957) (finding insufficient evidence of gross negligence because the defendant was speeding in the wee hours of the morning, in a non-residential part of the city, when traffic was light); *Albrecht*, 336 Md. at 491–92, 649 A.2d at 343–44 (applying a "reasonable officer standard," this Court found sufficient evidence of gross negligence in officer-involved shooting, based on expert testimony that the officer failed to follow departmental protocol and that the victim did not pose a threat when the officer leveled a shot gun at the victim); *State v. Pagotto*, 361 Md. 528, 533, 762 A.2d 97, 110 (2000)

21

(finding insufficient evidence of gross negligence in officer-involved shooting because the conduct was not likely at any moment to cause death or serious physical injury); *Mills*, 13 Md. App. at 202, 282 A.2d at 150 (finding that a combination of factors, including use of alcohol and inexperience with weapons, elevated the conduct from mere negligence to gross negligence). The *Thomas* decision expanded the circumstances in which we discussed this type of involuntary manslaughter to include the distribution of heroin, holding that there was sufficient evidence to convict the defendant of involuntary manslaughter in connection with the sale of heroin and subsequent overdose of a customer. *Id*. at 172, 211 A.3d at 297.

In the *Thomas* case,[25] the Court concluded that the evidence was sufficient to prove that Thomas exhibited a wanton and reckless disregard of a high degree of risk to human life. *Id*. at 160–61, 211 A.3d at 289–90. We reached this conclusion by combining "the inherent dangerousness of the act engaged in, as judged by a reasonable person … with environmental risk factors, which, together, make the particular activity more or less 'likely at any moment to bring about harm to another.'" *Id*. at 159, 211 A.3d at 289. We reasoned that (1) the sale of heroin involved inherent safety risks because of its "propensity to harm physically, if not kill, [those] . . . ingesting it[,]" *Id*. at 167, 211 A.3d at 294, and (2) the record reflected environmental risk factors, such as the high number of heroin and other opioid related deaths in the Worcester County area, the victim's particular vulnerability,

---

[25] In *Thomas*, a twenty-three-year-old heroin addict, Colton Matrey ("Colton"), purchased four bags of heroin from his dealer, Patrick J. Thomas ("Thomas"). *Thomas*, 434 Md. at 147, 211 A.3d at 282. He later died from an overdose. *Id*.

22

and the dealer's significant experience as a user and distributor of heroin. *Id*. at 169, 211 A.3d at 295–96. The analysis of environmental risk factors was supported by an expert opinion that Worcester County was "consumed with heroin overdoses, some resulting in deaths, and that these overdoses [] resulted in an acute awareness of the dangers of heroin." *Id*. at 168, 211 A.3d at 294. Weighing the inherent dangerousness of the conduct and the environmental risk factors, this particular sale of heroin posed a "high degree of risk to human life" sufficient for a finding of gross negligence. *Id*. at 161, 211 A.3d at 290 (citing *Dishman v. State*, 352 Md. 279, 299, 721 A.2d 699, 708 (1998) (internal citations omitted)).

We did not limit the gross negligence inquiry to inherent dangerousness and environmental factors. In addition, "the defendant, or an ordinarily prudent person under similar circumstances, should be conscious of [the] risk [to others]." *Id*. at 167, 211 A.3d at 294 (citing *Albrecht*, 336 Md. at 500, 649 A.2d at 336). We concluded that Thomas, who was a seasoned drug dealer, should have appreciated the "increased risk of the transaction."[26] *Id*. at 169, 211 A.3d at 295. The facts supported the conclusion that a reasonable person under like or similar circumstances would have thought it substantially risky to sell heroin to Colton on that particular occasion, given his vulnerability and desperation for the drug. *Id*. at 169–70, 211 A. 3d at 295. Accordingly, this Court reversed

---

[26] The night of the overdose, Colton called Thomas twenty-seven or twenty-eight times in just twenty-two minutes in an attempt to purchase the heroin. *Id*. He also sent several frantic text messages asking Thomas to call him before Thomas returned the call. *Id*. Thomas also noted that it was "unusual" for him to meet Colton late at night, stating that previous transactions had occurred earlier in the day. *Id*. Additionally, Thomas was aware that Colton was a "young boy." *Id*. at 163–64, 211 A.3d at 291.

the Court of Special Appeals and held that there was in fact sufficient evidence of gross negligence. *Id*. at 180, 211 A.3d at 302.

In applying the formulation of involuntary manslaughter articulated in *Thomas,* the State argues that Ms. Morrison was grossly negligent, because of a combination of environmental risk factors and the inherent dangerousness of sharing a bed with an infant after imbibing "a lot of alcohol in a short period of time." We disagree. The conduct at issue did not amount to a "wanton and reckless disregard for human life," because the conduct did not exhibit a gross departure from that of an ordinary person. The conduct was not a gross departure because it was not a substantial deviation from that of an objectively reasonable person. Additionally, there was no evidence of inherent dangerousness combined with attendant environmental risk factors that would justify the conviction. There are no facts supporting the idea that Ms. Morrison—or a reasonable person under similar circumstances—should have appreciated risks associated with co-sleeping after consuming beer. We explain.

> 2. <u>The State did not demonstrate that Ms. Morrison acted with wanton and reckless disregard for human life.</u>

As stated above, the State must demonstrate a wanton and reckless disregard for human life, which rests on whether the defendant's conduct exhibited a "gross departure" from that of an ordinary prudent person, so as to constitute an indifference to the risk to and rights of others. *Albrecht,* 336 Md. at 500, 649 A.2d at 348; *Duren,* 203 Md. at 590, 102 A.2d at 280. "[A] wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights

24

of others that he acts as if such rights did not exist." *Barbre*, 402 Md. at 187, 935 A.2d at 717.

The wanton and reckless disregard inquiry also includes an "assessment of whether the activity is more or less 'likely at any moment to bring harm to another.'" *Thomas*, 464 Md. at 159, 211 A.3d at 289 (internal citations omitted). This is determined by "weighing the inherent dangerousness of the act and environmental risk factors," which "must amount to a high degree of risk to human life." *Id*. The defendant, or a reasonably prudent person, must also be aware of the risk and subsequently disregard it.

Ms. Morrison did not engage in conduct that was "inherently dangerous." *Id*. at 169, 211 A.3d 274 at 295 (quoting *Commonwealth v. Catalina,* 407 Mass. 779, 556 N.E.2d 973 (Mass. 1990) (internal citations omitted)). In *Thomas*, and the cases relied upon in that decision, the underlying conduct involved was "inherently dangerous." *See id*. (the sale of heroin is inherently dangerous); *Duren*, 203 Md. at 592, 102 A.2d at 281 (speeding in a residential and business district was likely at any moment to bring harm to another); *Albrecht*, 336 Md. at 502–03, 649 A.2d at 349 (conduct during officer-involved shooting was grossly negligent); *Mills*, 13 Md. App. at 198, 282 A.2d at 148 (pointing a loaded gun at another was gross negligence under the circumstances). An activity is inherently dangerous when it creates a substantial or high degree of risk to human life, such that it is "likely at any moment to bring harm to another." *Thomas*, 464 Md. at 167, 211 A.3d 293 (internal citations omitted). To determine whether a risk is substantial, this Court considers "both the likelihood that the harm will occur and the magnitude of potential harm. . . ." *Thomas*, 464 Md. at 167, 211 A.3d at 294 (citing *People v. Hall*, 999 P.2d 207, 218 (Colo.

25

2000)). The defendant in *Thomas* was an experienced drug dealer engaged in the sale of heroin. Inherent in this practice was the likelihood that the conduct could bring about death or physical harm to another. However, co-sleeping with a four-month old after consuming beer does not necessarily pose such an inherent risk of death or serious physical harm.

Although the State introduced evidence that the *safest* way for a baby to sleep is alone in a crib or bassinet, the State did not introduce evidence that Ms. Morrison was aware of the risks of co-sleeping, or that a reasonable person under the circumstances would have appreciated those risks. The hospital's postpartum discharge paperwork signed by Ms. Morrison reflected the following:

> Make sure your baby has a safe sleep environment. This means you[r] baby should be in an approved crib or bassinet on his/her back (not the side) without any positioning devices, pillows or stuffed animals. You should also keep the crib or bassinet in your room.

These instructions do not expressly address dangers associated with the practice of co-sleeping. It is not uncommon for parents to sleep in the same bed with their infant, nor is it uncommon for a four-month-old to sleep in his or her own nursery. The "Education Record" included with the discharge paperwork also reflects that "back to sleep and SIDS prevention" and "crib safety" were discussed, but do not explicitly reference associated risks. The fact that Ms. Morrison received this information does not sustain a finding of gross negligence because it does not prove that Ms. Morrison knew of the risks and disregarded them. This deviation from best sleeping practices does not lend itself to a finding that Ms. Morrison was grossly negligent when she shared a bed with her infant, or that Ms. Morrison acted unreasonably under the circumstances.

26

The State concedes that co-sleeping is a common practice. *See* Centers for Disease Control and Prevention*, About 3,500 babies in the US are lost to sleep-related deaths each year,* https://www.cdc.gov/media/releases/2018/p0109-sleep-related-deaths.html (citing a 2015 study of mothers conducted by the CDC, in which more than sixty percent (61.4%) of respondents reported bed-sharing with their infant) (last visited July 17, 2020), archived at https://perma.cc/6P78-3HF7. Nothing about the discharge paperwork suggests that Ms. Morrison, or any other reasonable person under similar circumstances, would have appreciated or been conscious of any risks associated with sleeping in the same bed with an infant. In fact, that co-sleeping is such a common practice among mothers, who likely received the same or similar information regarding safe sleeping practices, when discharged from the hospital, negates the argument that that Ms. Morrison, or a reasonable parent in her situation, should have appreciated the risks of co-sleeping.

The State now argues that the co-sleeping was not the primary issue. Rather, the conduct of sleeping in the same bed with her children while "intoxicated" posed a substantial risk of death or serious physical harm to I.M. The State contends that the consumption of alcohol before sleeping with her daughters was "inherently dangerous conduct" that posed a "substantial risk of injury or death." The State directs us to Maryland cases that have "recognized that intoxication, combined with other conduct, creates a substantial risk to others" sufficient for a finding of gross negligence. However, none of those cases involve co-sleeping or other child rearing activities while "intoxicated."

For example, in *Blackwell v. State*, the Court of Special Appeals held that evidence of extreme intoxication before operating a motor vehicle and subsequent erratic driving

27

were sufficient to sustain a conviction for involuntary manslaughter because the defendant operated a known dangerous instrumentality while intoxicated. 34 Md. App. 547, 369 A.2d 153 (1977). There, the State introduced evidence that the defendant had traveled to several separate locations, between 5 p.m. and 10 p.m., where he consumed five rum and Coke drinks. *Id*. at 564, 369 A.2d at 164. Before the accident, he was seen in the parking lot stumbling and attempting to enter another vehicle before entering his own and driving off. *Id*. at 557, 369 A.2d at 160. As he drove off, he was observed swerving "back and forth" across the road. *Id*. at 558, 369 A.2d at 160–61. The defendant later struck and killed a bicyclist. *Id*. at 548, 369 A.2d at 155–56. The court reversed the trial court, which found that the evidence was legally insufficient to support a conviction for manslaughter. *Id*. at 570, 369 A.2d at 167. The court reasoned that the evidence the State presented "gave rise to an inference of insobriety[]" and the level of intoxication coupled with driving an automobile—a known "dangerous instrumentality[]"—on a public highway made his conduct criminally culpable, i.e., grossly negligent. *Id*. at 565; 557, 369 A.2d at 160; 164.

Unlike in *Blackwell*, there was no indicia of extreme or serious impairment. *Id*. at 557, 369 A.2d at 160. Co-sleeping is not an inherently dangerous activity. Even if the co-sleeping occurred subsequent to the consumption of alcohol, a substantial risk of death or bodily harm does not necessarily follow. The State asserts that "it is common knowledge that consuming enough alcohol to cause a person to pass out is inherently dangerous conduct," but evidence of any degree of impairment was not reflected at trial. Even in the light most favorable to the State, the evidence does not demonstrate that Ms. Morrison "drank to the point of passing out" and "her subsequent conduct of getting into bed with

28

her infant" would not have led a reasonable juror to find that this conduct amounted to a "wanton or reckless disregard for human life." *Mills*, 13 Md. App. at 200, 282 A.2d at 149.

Ms. Morrison testified that she was an infrequent drinker and had consumed four cups of beer over a period of two and a half to four hours. After consuming her last cup of beer, she waited outside for a while. Then, she took the trash out, locked the doors, changed I.M.'s diaper, "pumped," turned off the movie her four-year-old had fallen asleep watching, changed the channel to PBS, and went to sleep. These activities were consistent with their nightly routine. The social worker and officers who interacted with Ms. Morrison also testified that Ms. Morrison did not appear intoxicated, noting that she was not staggering or slurring her speech, and she did not smell of alcohol. The State maintains that Ms. Morrison admitted to being "drunk," but this evidence does not "give rise to an inference of insobriety" or impairment. *Blackwell*, 34 Md. App. at 557, 369 A.2d at 160. Assuming, *arguendo*, that Ms. Morrison drank enough beer to "pass out," there were no facts reflecting that Ms. Morrison knew that socially drinking at her own residence would create a substantial risk of harm to her children. None of the cases cited by the State compel us to reach such a conclusion.

Not all activity which is likely to bring about harm is sufficient to support a finding of gross negligence. *See Thomas,* 464 Md. at 169, 211 A.3d at 295 ("distribution [of heroin] alone[] does not *always* amount to gross negligence"). *Thomas* instructs that we consider attendant environmental factors—the surrounding circumstances—in a given case to determine whether the conduct amounts to a wanton and reckless disregard for human life. There, the Court relied on the proffered expert testimony of a controlled dangerous

29

substance ("CDS") investigator to differentiate between the sale of heroin generally and the sale in *Thomas*. *Id*. at 168, 211 A.3d at 294. Had the case proceeded to trial,[27] the CDS expert would have testified that Worcester County had been "consumed" by heroin overdoses and that, given prevalence of heroin-related deaths, "everyone kn[ew]" "the dangers of heroin." *Id*. at 147, 211 A.3d at 282. The Court also examined Maryland-specific data reflecting that the number of heroin overdoses and deaths rose significantly between 2011 and 2015—the year Colton overdosed. *See id*. at 168, 211 A.3d at 294 ("[The] proffered testimony [of the expert] [was] consistent with data collected by the State of Maryland's Department of Health and Mental Hygiene regarding fatal overdoes from heroin and other opioids."). The Court considered those attendant factors to elevate the conduct from ordinary to gross negligence.

In *Mills*, the Court of Special Appeals similarly assessed the surrounding circumstances or environmental factors. In that case, a sixteen-year-old brought his father's gun to a school dance, where he jokingly aimed the gun at the friend. *Mills*, 13 Md. App. at 198, 282 A.2d at 148. The friend slapped the gun from his hand and it discharged, striking and killing another boy. *Id*. at 198–99, 282 A.2d at 148. The "additional facts that the individual had little experience with weapons, was drinking, and pointed it jokingly at another surmount the gross negligence bar." *Thomas*, 464 Md. at

---

[27] The parties submitted an agreed upon statement of facts. Accordingly, "there was no 'trial'. . . in the traditional sense. . . . So, like the trial court, [this Court] accept[ed] the parties' agreed 'ultimate facts' and 'simply appl[ied] the law to the facts agreed upon[.]'" *Thomas*, 464 Md. at 151–52, 211 A.3d at 284–85 (internal citations omitted).

159, 211 A.3d at 289. Unlike *Mills* and *Thomas*, the surrounding circumstances do not raise the conduct to gross negligence. The State did not introduce expert testimony regarding the frequency of co-sleeping deaths, or that the risk of rolling over on an infant while co-sleeping is elevated when a caregiver engages in social drinking before co-sleeping. Additionally, the evidence reflects that Ms. Morrison was the mother of seven children—who routinely shared a bed with her small children. Under the standard articulated in *Thomas*, the evidence did not support a finding of gross negligence.

We now turn to cases from other jurisdictions where gross negligence was addressed within the context of sleep-related child deaths. The State relies on *Cornell v. State*, a Florida Supreme Court case, which held that the evidence of intoxication was sufficient to support a manslaughter conviction, in support of the argument that a reasonable person would have appreciated that sleeping with an infant after consuming a lot of alcohol in a short period would create a substantial risk of death or serious physical injury to her children. *Cornell*, 159 Fla. at 691, 32 So.2d at 612.

The State's reliance on *Cornell* is misplaced. In *Cornell*, the evidence demonstrated that Emily Cornell took her two-and-a-half-month-old grandchild to a bar where she became "so intoxicated that she did not remember leaving the bar, arriving [home], or going to bed with the infant child beside her." *Id*. at 690, 32 So.2d at 612. Cornell and the child's mother arrived at the Grand Oregon Bar around eleven or twelve o'clock at night. Before entering the bar, they drank from a whiskey bottle. *Id*. at 688, 32 So. 2d at 611. "There was testimony that approximately three hours prior to [their arrival at the bar], each of the parties [had] been seen taking at least one drink, but it was not shown that they had

31

become intoxicated as a result." *Id*. While at the bar, Cornell consumed two to three more drinks. Her daughter left the infant in Cornell's care around 2 or 2:30 a.m., while she continued to celebrate with friends. *Id*. Roughly sixteen hours later, the mother returned to her trailer to find the deceased infant in the bed next to Cornell. *Id*. at 688–99, 32 So.2d at 611. Several neighbors testified that they heard the child screaming loudly around 6:30 a.m. and that the loud screams continued until 9:30 or 10 a.m. before subsiding. *Id*. at 689, 32 So.2d at 611. One witness described the cries: "He cried like he was losing his breath, then he would start again; just like they put their hand over his mouth." *Id*. The jury convicted Cornell and her daughter of manslaughter. *Id*. at 689, 32 So.2d at 611.

The Florida Supreme Court upheld Cornell's manslaughter conviction but reversed her daughter's conviction. *Id*. at 691, 32 So.2d at 612. It reasoned that Cornell "recklessly and willfully [] [drank] herself into such a drunken stupor that not only did she render herself totally incapable of looking after the infant but actually became wholly oblivious to the fact that she had [the infant] in her possession at all." *Id*. at 690, 32 So.2d at 612. The court further reasoned that the evidence reflected that Cornell returned to her mobile home and climbed into bed with the infant in tow. *Id*. at 690, 32 So.2d at 612. She then "covered the body and face of the child with bed covers," and as a result the child suffocated to death. *Id*. at 688, 32 So.2d at 611. The child screamed for at least three consecutive hours, during which time Cornell was sound asleep. *Id*. at 689, 32 So.2d at 611. Tellingly, the infant shrieked so loud that her screams were heard by neighbors. *Id*. The court determined that it would have been reasonable for a jury to conclude that her conduct rose to the level of gross negligence. *Id*. at 690–91, 32 So.2d at 612.

32

This case is distinguishable from *Cornell*. There was no indicia of intoxication or impairment that would lead a rational trier of fact to believe that Ms. Morrison drank in excess on the night I.M. died. The four-year old, who was the only witness to Ms. Morrison rolling over on I.M., testified that she "threw stuff" at her mother and yelled for her to wake up. However, this alone does not support a finding of intoxication or impairment. A blood sample taken from Ms. Morrison was never tested. There was no testimony that Ms. Morrison exhibited the signs of impairment, such as slurred speech, watery, dilated pupils, or the odor of alcohol on her breath or person.[28] There was also no testimony that Ms. Morrison could not remember when or how she got into bed with her children. She admitted that she shared a bed with her infant and four-year-old, as she had done in the past with her five older children when they were young.

Ms. Morrison also engaged in normal, routine behavior before actively going to bed. The record reflects that Ms. Morrison prepared her children for bed and went to sleep with them. When interviewed by the detective, Ms. Morrison remembered preparing for bed and going to sleep. In contrast, the defendant in *Cornell* was so intoxicated that she had no memory of leaving the bar and no memory of getting into bed with the infant. *Id*. at 690, 32 So.2d at 612. In addition, she slept through the infant's incessant screams, which were heard by neighbors for hours. *Id*. at 689, 32 So.2d at 611. There was no evidence in

_____

[28] Although Sgt. Wilson testified that Ms. Morrison responded initially that "she got drunk and killed [her] baby[,]" he also did not recall any behavior or conduct on the part of Ms. Morrison that was consistent with someone who was impaired or under the influence of alcohol. Ms. Morrison's statement, in and of itself, does not establish proof that she was impaired or under the influence of alcohol.

33

the case at bar of the length of time I.M. was crying, or the extent of the four-year-old's efforts to awaken Ms. Morrison. Accordingly, the State's comparison to *Cornell* misses the mark.

In *State v. Merrill,* a Utah case, Trevor Merrill was charged with homicide, child abuse homicide, and reckless endangerment in connection with the death of his three-and-half-month-old son. 269 P.3d at 199. On August 18, 2006, Merrill shared a bed with his infant and the child's mother. *Id*. at 198. Merrill later discovered the infant unconscious in the bed next to him. *Id*. The medical examiner determined that the most likely cause of death was "'positional asphyxia based upon the age of the child and the fact that [the child] was originally placed on [his] back and now [the child is] found in a face-down position on a bed.'" *Id*. at 199. Merrill argued that there was no evidence of criminal culpability because "co-sleeping with an infant does not create a substantial and unjustifiable risk of injury or death to an infant nor does it constitute a gross deviation from the standard of care that an ordinary person would exercise." *Id*. at 203.

The Utah Court of Appeals determined that there was sufficient evidence of actual and perceived risk because Merrill was a heavy sleeper who had previously lost an infant daughter under similar circumstances. *Id*. at 204. Based on this evidence, the court concluded that a magistrate could infer that a reasonable person in his position would not have shared a bed with an infant in the same manner that caused a previous sleep-related death. *Id*. at 204–05. Conversely, the State did not introduce evidence that Ms. Morrison lost a child as a result of sleeping in the same bed with her children. In fact, the evidence

34

reflected that Ms. Morrison was an experienced parent who shared a bed with children without incident.

*Bohannon v. State* is similarly distinguishable from this case. 230 Ga. App. at 829, 498 S.E.2d at 316. Mary Francis Bohannon was convicted of involuntary manslaughter after her two-month-old died from asphyxia during overlay. *Id.*, 498 S.E.2d at 319. The evidence reflected that Bohannon suffered from alcohol addiction and that a DFCS child abuse investigator had investigated the parents of the infant due to concerns about the child's welfare. *Id.* Bohannon and the DFCS executed a safety plan, in which, Bohannon agreed to engage a reliable babysitter if she intended to drink, and that she would not have her children in her custody unless she was sober. *Id.* Less than two weeks after meeting with the DFCS investigator to execute the safety plan, Bohannon and the child's father retrieved the child from the babysitter after a night of drinking. *Id.* There was evidence that Bohannon consumed a six-pack of beer and four sixteen-ounce cups of whiskey and Coke. *Id.* at 832, 498 S.E.2d at 321. The babysitter testified that the couple "smelled of alcohol" and had noticeably been drinking. *Id.* The child's father was observed stumbling, but Bohannon's degree of intoxication was less clear. *Id.* The next morning, Bohannon discovered that the child's father had rolled on top of the baby in a drunken sleep. *Id.* at 833, 498 S.E.2d at 322.

The court also considered expert testimony from a medical examiner regarding child "overlay" cases, before determining there was sufficient evidence for a jury finding that Bohannon consciously disregarded a risk of harm. *Id.* at 834, 498 S.E.2d at 322. The expert testified that, "in most of these [cases], the primary [factors] are intoxication,

35

whether it's alcohol or drugs, and morbid obesity[.]" *Id.* The expert also testified that, "based on his experience, []the sense of awareness, judgment, and physical skills of intoxicated people are less than when they are sober." *Id*. at 834, 498 S.E.2d at 322–23. The Georgia Court of Appeals found that the record was replete with evidence of Bohannon's alcohol addiction and abuse, and that a rational trier of fact could find "'conscious disregard' from the fact of placing a baby, less than three months old, in a bed so that it would be between two intoxicated and subsequently sleeping adults." *Id*. at 834, 498 S.E.2d at 323. In contrast, the State in the case at bar did not introduce expert testimony indicating that the risks of sleeping with an infant are enhanced when alcohol is involved. More importantly, there was insufficient evidence of the impact, if any, that alcohol had on Ms. Morrison at the time. Because there was insufficient evidence of gross negligence—wanton and reckless disregard for human life—the conviction for involuntary manslaughter was properly reversed.

B.     **The evidence was insufficient to sustain a conviction for reckless endangerment.**

Reckless endangerment is a statutory crime,[29] which requires prima facie showing that: (1) that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another; (2) that a reasonable person would not have engaged in that conduct; and (3) that the defendant acted recklessly." *Jones v. State*, 357 Md. 408, 420, 745 A.2d 396, 403 (2000). Like the gross negligence form of involuntary manslaughter, the applicable standard for reckless endangerment is an objective one.

---

[29] Md. Code, Crim. Law Art., § 3-204(a)(1).

Criminal recklessness is assessed by considering whether the conduct, "viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe, and thereby create the substantial risk that the statute was designed to punish." *Minor v. State*, 326 Md. 436, 443, 605 A.2d 138, 141 (1992). As such, we begin with whether the State presented sufficient evidence to support the finding that, (1) Ms. Morrison's decision to share a bed with her two minor daughters after consuming a few beers was a "gross departure from the standard of conduct that a law-abiding person would observe," (2) her conduct "create[d] a substantial risk of death or serious bodily harm," and (3) she acted recklessly. *Holbrook v. State*, 364 Md. 354, 366–67; 371, 772 A.2d 1240, 1247; 1249 (2001) (internal citations omitted). The reckless endangerment conviction turns on much of the same evidence as the involuntary manslaughter conviction, and that evidence was not sufficient to support the conviction because Ms. Morrison did not "create a substantial risk of death or serious physical injury" to I.M., just by virtue of having co-slept with I.M. after consuming alcohol.

Based on the reasoning expressed above, there was insufficient evidence that Ms. Morrison engaged in conduct that was a "gross departure" from what would be expected of an ordinary reasonable person. The State did not present evidence to support its assertion that the decision to co-sleep with her children after drinking alcohol posed a substantial risk of death or serious injury for I.M. As such, we hold that the evidence was insufficient to support the conviction for reckless endangerment.

The dissenting opinion takes the position that "*any* rational trier of fact could have found the essential elements [of the crimes charged] beyond a reasonable doubt."

37

According to the State and the dissent, viewing the evidence in the light most favorable to the prevailing party, the evidence demonstrated, at most, that:

> On the night of September 1, 2013, sometime between 10:00 p.m. and midnight, [Ms.] Morrison put her daughters to bed in a full-sized bed that she shared with both girls[;] [Ms.] Morrison then took to the porch where she drank beer and had a virtual "mom's night out" with friends from Virginia to celebrate the first day of school[;] [Ms.] Morrison drank enough beer in a short enough period of time to admit to being drunk[;] [a]fter drinking, [Ms.] Morrison—who had been given a safe place for I.[M.] to sleep … and information [regarding] safe sleeping practices for infants—laid in bed with the girls and fell asleep; she could not remember and did not know what happened after that—except for what she had been told[;] [s]ometime after [Ms.] Morrison laid down, [the four-year-old] woke up and saw that Ms. [Morrison] had rolled on top of I.[M.]; [the four-year-old] "threw stuff" at [Ms.] Morrison in an effort to wake her up … [;][w]hen the paramedics arrived, I.[M.] was not breathing, she had no heartbeat, and her body was stiff; they could not revive [her]; [and] [w]hen [Sgt.] Wilson arrived, [Ms.] Morrison told him that she "got drunk" and "killed" I.[M.].

Ms. Morrison's conduct did not reach the level of sufficiency that is warranted for a finding of *gross* negligence. As mentioned previously, there is a fine, but necessary distinction between simple and gross negligence. In order for the conduct to reach the level necessary for a finding of gross negligence, the conduct must be so reckless that it amounts to a conscious disregard for the rights of others. Gross negligence "sets the evidentiary hurdle at a higher elevation[]" than simple negligence. *Beall v. Holloway-Johnson*, 446 Md. 48, 64, 130 A.3d 406, 415 (2016). The State did not meet that burden.

As reflected in the concurring opinion, the standard of review does not allow us to speculate that the reason the four-year-old could not awaken Ms. Morrison was because she was so impaired by alcohol that she effectively "passed out." The four-year-old simply testified that her mother was in a "deep sleep." Ms. Morrison testified that she pretended

38

to sleep, thinking that the four-year-old was trying to disturb her and I.M. while they slept. In the absence of *any* evidence of intoxication or the extent thereof, the State fell short of proving that Ms. Morrison, or any other reasonable person in her position, would have appreciated the risks associated with sleeping in the same bed as an infant, after drinking alcohol.

The dissent also opines that a large majority of mothers who co-sleep with their children, "would agree that it is inherently dangerous to co-sleep with an infant when a parent goes to bed seriously impaired by alcohol," because "[i]t is a matter of common knowledge that the excessive use of liquor or drugs impairs the perceptual, judgmental and volitional faculties of the user," *State v. Jenkins*, 88 Conn. App. 762, 774, 872 A.2d 469, 476 (Conn. App. 2005), and generally "slows reaction[.]" *Warr v. JMGM Grp., LLC*, 433 Md. 170, 240 n.28, 70 A.3d 347, 389 n.28 (2013) (Adkins, J., dissenting). However, there is no direct or circumstantial evidence of "excessive" drinking or impairment. We are limited to the evidence in the record and the evidence presented to the jury did not reflect that Ms. Morrison drank in excess on the night that I.M. died.

We also caution, as we have done before, that parental decision-making in child neglect and gross negligence cases should be judged by the conduct itself and not the "resultant harm." *See Hall*, 448 Md. at 331, 139 A.3d at 943 (citing *Mills*, 13 Md. App. at 200, 282 A.2d at 149). The conduct itself is the ultimate determinant. In other words, we employ an objective reasonableness standard to avoid a "20/20 hindsight" assessment of "what may have or could have occurred[.]" *Id.* at 332*,* 139 A.3d at 944. Such hindsight bias has the power to "distort the risk of parental inaction so that *all* risk becomes

39

substantial." *Id.* at 331–32, 139 A.3d at 944 (emphasis added) (citing David Pimentel, *Criminal Child Neglect and the "Free Range Kid": Is Overprotective Parenting the New Standard of Care?*, 2012 Utah L. Rev. 947, 988. It is undisputed that Ms. Morrison (1) consumed some amount of alcohol, (2) slept in the same bed as her infant, and (3) I.M. died by asphyxiation as a result of Ms. Morrison laying on top of her. Despite that information, the evidence adduced at trial does not show that her conduct created a "substantial risk" of harm, sufficient for a finding of gross negligence. Holding otherwise would seemingly penalize Ms. Morrison for the unintended consequence of conduct she was not aware posed a substantial risk of death or serious bodily harm to her child.

## CONCLUSION

For the reasons we have explained *supra*, we affirm the judgment of the Court of Special Appeals. The evidence was insufficient to support the convictions for involuntary manslaughter and reckless endangerment, because the conduct neither rose to the level of gross negligence nor constituted a "gross departure from the conduct of a reasonably prudent person," such that it could be deemed reckless.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

40

Circuit Court for Baltimore City
Case No. 113303023
Argued: March 5, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 56

September Term, 2019

_____

STATE OF MARYLAND

v.

MURIEL MORRISON

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Concurring Opinion by Watts, J., which
Barbera, C.J., and Booth, J., join.

_____

Filed: July 28, 2020

Respectfully, I join the majority opinion and write separately in concurrence to add my view. This case arises out of the tragic death of a baby whose mother co-slept with her. In keeping with the Majority, I would hold that the evidence was insufficient to support Muriel Morrison's, Respondent's, convictions for involuntary manslaughter and reckless endangerment. From my perspective, although a parent consuming alcohol and co-sleeping with a baby resulting in the baby's death could theoretically form the basis for convictions for involuntary manslaughter and reckless endangerment, under the circumstances of this case, no rational trier of fact could have found the elements of either crime beyond a reasonable doubt, and the behavior that underlies the convictions consists of conduct that even the State, Petitioner, acknowledges is not criminal or even inherently dangerous.

In assessing the sufficiency of the evidence, I believe it is important to identify precisely the sequence of events established by the relevant evidence, particularly, Ms. Morrison's and her daughter's testimony, and explain that the evidence does not support the convictions. While a survey of other cases involving alleged gross negligence and a comparison of the facts of those cases to this case's facts is a valuable approach to resolving the question of the sufficiency of evidence, a review of the evidence alone in this case leads to the inescapable conclusion that neither the elements of involuntary manslaughter nor reckless endangerment were established beyond a reasonable doubt. Although a parent co-sleeping with a child after consuming alcohol could potentially pose a risk of serious physical injury to the child, and even a substantial risk of death, to secure convictions for the offenses of involuntary manslaughter and reckless endangerment, the State must prove

all of the elements of the offenses beyond a reasonable doubt, which, in this case, taking the evidence in the light most favorable to the State, it did not.

Even under the relevant standard of review,[1] without evidence that an ordinarily prudent parent, *i.e*., reasonable parent, would have been cognizant of a risk associated with co-sleeping and that Ms. Morrison was so significantly impaired as to disregard the risk, no juror could have found beyond a reasonable doubt that establishing that a parent co-slept with a baby after drinking beer means that the parent should have known of a risk of death or injury to the baby and that the parent recklessly disregarded it. In short, an analysis of the sufficiency of the evidence in this case boils down to whether a rational juror could have concluded beyond a reasonable doubt that Ms. Morrison should have been aware of a risk involved with co-sleeping with her infant and was so seriously impaired as to disregard the risk. Framing the issue to be whether an ordinarily prudent person would know that co-sleeping with a baby after drinking alcohol to the point of becoming impaired involves a risk of death or injury to a baby assumes the circumstance that a parent is impaired, and this is a fact that the State in this case failed to prove beyond a reasonable doubt.

On the night of September 1, 2013 into the morning of September 2, 2013, Ms. Morrison was living with two of her children, one of whom was four months old, and the

---

[1]"In determining whether the evidence is legally sufficient, we examine the record solely to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In examining the record, we view the State's evidence, including all reasonable inferences to be drawn therefrom, in the light most favorable to the State." Fuentes v. State, 454 Md. 296, 307, 164 A.3d 265, 272 (2017) (cleaned up).

other of whom was four years old ("Ms. Morrison's daughter"). As a witness for the State, Ms. Morrison's daughter, who was seven years old at the time of trial, testified that, on the night at issue, she, Ms. Morrison, and Ms. Morrison's baby were in the same bed together, with the baby between them. At some point, Ms. Morrison rolled over on top of the baby. According to Ms. Morrison's daughter, when she saw her baby sister under her mother, she did not say anything "[u]ntil my daddy come[.]" Questioning by the prosecutor revealed that Ms. Morrison's daughter did not say anything until her father telephoned. During direct examination, the following exchange occurred:

> [THE PROSECUTOR:] Okay. And your baby sister was laying on top of your mommy, or under your mommy, or somewhere else?
>
> [MS. MORRISON'S DAUGHTER:] Under.
>
> [THE PROSECUTOR:] When you saw your baby sister under your mommy, did you say anything?
>
> [MS. MORRISON'S DAUGHTER:] No. until my daddy come, don't do that (Inaudible at 10:07:59 a.m.)
>
> [THE PROSECUTOR:] That's okay. Did you try to get your sister, move your sister?
>
> [MS. MORRISON'S DAUGHTER:] Yes.
>
> [THE PROSECUTOR:] And how did you try to move your sister?
>
> [MS. MORRISON'S DAUGHTER:] I -- I threw stuff at her when my dad called. And -- and then at first I answered the phone because my dad called. And then I -- I -- then I threw stuff at her.
>
> [THE PROSECUTOR:] It's her, you mean your mom?
>
> [MS. MORRISON'S DAUGHTER:] Yes.
>
> [THE PROSECUTOR:] Okay. When you threw stuff at you[r] mom, did she

wake up?

[MS. MORRISON'S DAUGHTER:] No.

[THE PROSECUTOR:] Did you try to talk to your mom?

[MS. MORRISON'S DAUGHTER:] No -- yes.

[THE PROSECUTOR:] Did you try to wake her up?

[MS. MORRISON'S DAUGHTER:] Yes.

[THE PROSECUTOR:] Okay.  And what did you say to your mom to wake her up?

[MS. MORRISON'S DAUGHTER:] I said -- I said, "Mom," -- I said, "Mom, you're on my baby sister" at that point.

[THE PROSECUTOR:] Did your mommy wake up when you yelled at her?

[MS. MORRISON'S DAUGHTER:] No, no.

After Ms. Morrison's daughter responded no, the State introduced an exhibit into evidence and asked no further questions on direct examination.

On cross-examination, Ms. Morrison's daughter testified that the telephone rang, and she answered it and spoke to her father.  Ms. Morrison's daughter testified that Ms. Morrison did not speak with her father but woke up out of a "deep, deep sleep[,]" was laying on the baby, and said the baby was okay.  The following exchange occurred:

[DEFENSE COUNSEL:] Okay.  Did she take the phone and talk to daddy then?

[MS. MORRISON'S DAUGHTER:] No.

[DEFENSE COUNSEL:] So she just woke up?

[MS. MORRISON'S DAUGHTER:] Yes.  She woke up out of her deep, deep sleep.

[DEFENSE COUNSEL:] Okay.

[MS. MORRISON'S DAUGHTER:] And --

[DEFENSE COUNSEL:] And what did she do then when she woke up?

[MS. MORRISON'S DAUGHTER:] Then after she woke up, she kept laying on my baby sister. And when I said, "Get up, Mommy, you laying on my baby sister," she said she was okay. She wasn't.

Ms. Morrison's daughter also testified that, later, closer to the morning, she woke up, went downstairs to get some juice, returned to the bedroom, and saw that Ms. Morrison was lying on the baby. Specifically, on direct examination, the following exchange occurred:

[THE PROSECUTOR:] Let's talk about how she got to the hospital? Do you remember what happened right before the hospital?

[MS. MORRISON'S DAUGHTER:] Yes.

[THE PROSECUTOR:] Tell me what happened?

[MS. MORRISON'S DAUGHTER:] Before, well -- before my baby sister went to the hospital, (Inaudible at 1:04:03 a.m.) I was going downstairs. I was like trying and find some juice.

[THE PROSECUTOR:] So you went downstairs to find some juice?

[MS. MORRISON'S DAUGHTER:] Uh-huh. And then I came back upstairs to -- and mommy was laying on my baby sister. And then I called for help. And I went down the basement -- to the basement because people lived down there. And my mother woke up.
And then when it was time, it was morning time, mommy got down right away. And then while -- and then my baby sister was died -- died.

Similarly, on cross-examination, the following exchange occurred:

[DEFENSE COUNSEL:] And when you made the drawing about where mommy was and where you[r] baby sister was, do you remember where you

- 5 -

were on the bed?

[MS. MORRISON'S DAUGHTER:] I was on the -- I was on the corner right here. And then when I woke up, I went downstairs, I snuck downstairs -- I'm not allowed to go downstairs -- that was a rule.

And then I went downstairs, tried to find the juice in the cabinet – juice we had. And then I came back upstairs. And when I went up there, then -- then I saw my momma laying on my baby sister. Then we woke up.

Nine -- 9-1-1 was called and my baby sister was gone at the hospital. I did not do that.

As a witness on her own behalf, Ms. Morrison testified that the baby was her seventh child, and that one of her children "never came home from the hospital."[2] Ms. Morrison explained that she had co-slept with all of her children, and that her mother and grandmother had co-slept with her. Ms. Morrison testified that she did not "know too many who" did not co-sleep with their children. Ms. Morrison did not recall anyone having discussed with her the dangers of drinking alcohol while caring for a child.

Ms. Morrison testified that on the evening of September 1, 2013, she and her friends were having a ritual moms' night out before their children went back to school, which she was doing from a distance over the telephone. She testified that she used Facebook to talk to her friends who were in Virginia. Ms. Morrison testified that she had "a couple of beers[.]" Specifically, Ms. Morrison testified that she "had like four cups of beer." She

---

[2]Prior to Ms. Morrison's testimony, other witnesses testified for the State. Sergeant Laron Wilson and Detective Jonathan Jones of the Baltimore Police Department and Latonya Townsend, a clinical social worker with Johns Hopkins, testified concerning their interactions with Ms. Morrison. A recording of a deposition of Anna Rubio, M.D., an Assistant Medical Examiner, was played for the jury. The circuit court admitted into evidence a document that was labeled "The Western Pennsylvania Hospital [/ Neonatal Intensive Care Unit] / Pediatric Discharge Instructions[.]" A summary of this testimony and evidence is recounted in the majority opinion.

testified that she told a detective that she had two twelve-ounce beers and "a 40 that [she] didn't finish." Ms. Morrison denied that the alcohol affected her in any way.

After Ms. Morrison finished drinking, she changed the baby's diaper. That night, Ms. Morrison, her daughter, and the baby slept in the same full-size bed. At some point, Ms. Morrison's daughter woke her up and said that her father had telephoned. Ms. Morrison telephoned her daughter's father, who did not answer, and Ms. Morrison laid back down. Afterward, Ms. Morrison's daughter said something to her, and Ms. Morrison closed her eyes to make her daughter think that she was asleep. Ms. Morrison put her arm over the baby to prevent her daughter from waking the baby up. Once Ms. Morrison believed that the baby had fallen asleep, she did the same.

At approximately 7:45 a.m., Ms. Morrison woke up and realized that the baby was not beside her. Ms. Morrison saw that the baby was "listless" and that "her lips were pale." Ms. Morrison testified that she called 911 and that paramedics arrived. Later, a law enforcement officer came into the bedroom to speak with Ms. Morrison, and she said: "No matter what, it's my fault. I couldn't save her."

The circuit court instructed the jury on involuntary manslaughter and reckless endangerment by quoting Maryland Criminal Pattern Jury Instructions 4:17.9A and 4:26B nearly verbatim as follows:

> [T]o convict the defendant of involuntary manslaughter, the State must prove that the defendant acted in a grossly negligent manner[,] and that this grossly negligent conduct caused the death of [the baby]. ["]Gross[ly] negligent["] means that the defendant, while aware of the risk[], acted in manner that created a high degree of risk to[,] and showed reckless disregard for[,] human life.

* * *

> [T]o convict the defendant of reckless endangerment, the State must prove that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another, that a reasonable person would not have engaged in that conduct, and that the defendant acted recklessly.
>
> The defendant acted recklessly if she was aware that her conduct created risk of death or serious physical injury to another[,] and that she consci[]ously disregarded that risk.

This Court has, as the majority opinion indicates, consistently indicated that there are three varieties of involuntary manslaughter—unlawful act manslaughter, gross negligence manslaughter, and the negligent omission to perform a legal duty. State v. Thomas, 464 Md. 133, 152, 211 A.3d 274, 285 (2019) (citations omitted). Gross negligence involuntary manslaughter involves "negligently doing some act lawful in itself[,]" which is "a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of indifference to the consequences." Id. at 152-53, 211 A.3d at 286 (citation omitted). The elements of reckless endangerment are: "1) that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another; 2) that a reasonable person would not have engaged in that conduct; and 3) that the defendant acted recklessly." Hall v. State, 448 Md. 318, 329, 139 A.3d 936, 942 (2016) (citation omitted).

Because gross negligence involuntary manslaughter includes all three of the elements of reckless endangerment, "[r]eckless endangerment is a lesser[-]included offense of the gross negligence variety of involuntary manslaughter." State v. Bowers, 349 Md. 710, 723, 709 A.2d 1255, 1261 (1998) (citations omitted). If the State fails to establish that an ordinarily careful and prudent person—*i.e.*, a reasonable person—would not have

engaged in the conduct in which the defendant engaged, then the State has failed to prove that the defendant is guilty of either gross negligence involuntary manslaughter or reckless endangerment.

Viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the State, the evidence was insufficient to establish that an ordinarily careful and prudent person—*i.e.*, a reasonable person—would have been aware that the conduct that Ms. Morrison engaged in created a risk of death or serious physical injury to her baby, or that she was so seriously impaired as to have a reckless disregard for her baby's life. Put simply, even under the relevant standard of review, in the absence of evidence that a reasonable parent would have been aware of the risk and that Ms. Morrison was so significantly impaired as to disregard the risk, no rational juror could find beyond a reasonable doubt that establishing that a parent co-sleeping with a baby after drinking beer means that the parent automatically knew of the risk of death to the baby and had a reckless disregard for the baby's life.

Importantly, in its brief, the State acknowledges that co-sleeping "is not extraordinary or even inherently dangerous," but contends that co-sleeping is inherently dangerous where an adult consumes enough alcohol to pass out. The point is that co-sleeping with a baby is not inherently dangerous behavior or behavior that in and of itself would satisfy the elements of gross negligence involuntary manslaughter. The State has to prove conduct that demonstrates that an ordinarily careful and prudent person would not take the same actions. Here, there is no evidence that Ms. Morrison had consumed enough beer to be impaired to the point of removing her co-sleeping with her daughter from the

not extraordinary type of co-sleeping that the State acknowledges does not rise to the level of gross negligence. The State's case rested largely on the testimony of Ms. Morrison's daughter and what the State alleged to be Ms. Morrison's own admissions. At oral argument, the State alleged that Ms. Morrison's gross negligence consisted of passing out (becoming impaired) and disregarding the risk of death to her baby while co-sleeping. There is insufficient evidence, however, to conclude that Ms. Morrison passed out due to drinking beer. Nor is there any evidence that Ms. Morrison was impaired as a result of drinking beer. While being interviewed by detectives, Ms. Morrison said that she drank two cups of beer and more than half of "a 40[.]" Ms. Morrison never said that the beer caused her to pass out, and denied that she was impaired in any way. Nor did the testimony of Ms. Morrison's daughter, the State's only eyewitness, establish that Ms. Morrison passed out or that she was impaired.[3]

Ms. Morrison's daughter was four years old at the time of the baby's death and seven years old when she testified at trial, and her testimony fell far short of establishing that a rational juror could conclude beyond a reasonable doubt that Ms. Morrison was

_____

[3]It does not appear that, at trial, the State introduced evidence concerning the alcohol by volume (ABV) content of any beverages that Ms. Morrison consumed. As such, to use information concerning the alleged ABV content of drinks consumed by Ms. Morrison to support the proposition that a rational trier of fact could have found that Ms. Morrison was seriously impaired and reverse the judgment of the Court of Special Appeals on that ground would be to base a decision about the sufficiency of the evidence on facts not in the record, *i.e.*, information that was not available to the jury. In other words, in reviewing the sufficiency of the evidence, it would be inappropriate, of course, to make a factual finding concerning the ABV content of beverages Ms. Morrison drank and assume that a rational juror would have been aware of the ABV content of the beverages and therefore able to infer that Ms. Morrison was seriously impaired.

impaired. Ms. Morrison's daughter essentially testified that she took a call from her father, tried to wake her mother who had rolled over on the baby, and that she (the daughter) went back to sleep. She testified that later she awoke, went to get juice, and returned and her mother was laying on the baby and her mother woke up. Ms. Morrison's daughter never testified that her mother was impaired before putting the baby to sleep, *i.e.*, acting differently than normally, that her mother's speech was different, that her mother appeared confused, or that her mother failed to do things that she would normally do for the baby or herself. To be sure, Ms. Morrison's daughter testified that when she first saw her mother laying on the baby she "threw stuff at" her mother and said: "Mom, you're on my baby sister[.]" According to Ms. Morrison's daughter, she took these actions in response to a telephone call from her father when she noticed that Ms. Morrison was asleep on the baby. Ms. Morrison's daughter did not testify as to what items she threw, how many items she threw, how hard she threw them, at what part of Ms. Morrison's body she threw them, how many times she spoke to Ms. Morrison, or how loud her voice was. Although the prosecutor asked Ms. Morrison's daughter whether Ms. Morrison woke up after she "yelled at her[,]" significantly, Ms. Morrison's daughter never testified that she yelled or raised her voice.

Overall, it is unclear what efforts Ms. Morrison's daughter, who was four years old at the time, took to attempt to wake her mother when her father called, and she realized that Ms. Morrison had rolled onto the baby. There is no indication of the intensity or persistence of Ms. Morrison's daughter's efforts to wake her or any indication that Ms. Morrison failed to become fully awake because she was passed out. Ms. Morrison's

- 11 -

daughter merely testified that her mother was in a deep sleep. The testimony of both Ms. Morrison and her daughter reveals that, at that point, Ms. Morrison awoke and spoke with her daughter, telling her that the baby was okay. Regardless of whether the jury accepted the State's version that Ms. Morrison did not wake up or as Ms. Morrison and her daughter testified that she awoke and said that the baby was alright, the testimony, under either scenario, did not establish that Ms. Morrison was passed out or unresponsive with her baby beneath her. Simply put, viewing the evidence in the light most favorable to the State, Ms. Morrison's daughter's testimony provided nothing more than that a four-year-old child attempted to wake a parent in some manner in the middle of the night and may have been unsuccessful—a not too uncommon occurrence.

Indeed, Ms. Morrison's daughter's testimony about the events of the evening support the determination that, although she saw Ms. Morrison laying on her baby sister, her efforts to wake Ms. Morrison were not substantial enough to lead to the conclusion that Ms. Morrison failed to awake because she was passed out or impaired. Ms. Morrison's daughter did not testify that she informed her father that her mother was laying on the baby even though her father was on the telephone at the time. After throwing things at her mother, Ms. Morrison's daughter apparently went back to sleep and awoke closer to the morning. She then went downstairs to get juice before trying to awake her mother. These observations are not meant to imply in any way that Ms. Morrison's four-year-old daughter was at fault in her handling of the situation, but rather are indicators that Ms. Morrison's daughter was not persistently trying to wake her mother up, but her mother was passed out. To the extent that the State relies on Ms. Morrison's daughter's testimony as evidence that

Ms. Morrison was passed out (or seriously impaired) due to alcohol consumption and therefore grossly negligent, this is mere speculation, unsupported by the evidence adduced at trial. Certainly, under the relevant standard of review, the evidence and all inferences therefrom are to be considered in the light most favorable to the State, but this does not allow for conjecture.

Significantly, Ms. Morrison's decision to co-sleep with the baby was not an isolated incident that resulted from a reckless disregard for human life due to alcohol consumption. To the contrary, as Ms. Morrison explained, she co-slept with all her children, including her baby. And, Ms. Morrison testified that when she was a child, her mother co-slept with her. Ms. Morrison was engaged in what for her was a routine and customary practice of co-sleeping with her children, not an activity brought about by disregarding the risk due to drunkenness.

In its brief, the State acknowledges that co-sleeping or bed-sharing "is not an uncommon practice[,]" and cites a 2015 survey by the Centers for Disease Control and Prevention, which indicated that 61.4% of the American mothers who responded indicated that they co-slept or bed-shared with their infants. The circumstance that co-sleeping is so common undermines the notion that a rational trier of fact would think that a parent who co-slept with a baby even after drinking beer should know that a substantial risk of death was involved and conclude that the parent recklessly disregarded the risk.

It cannot be assumed that it is common knowledge by all parents that co-sleeping with a baby after drinking alcohol may involve a risk of death to the baby. And, more importantly, even if it were common knowledge, this is an element of the offenses of

involuntary manslaughter and reckless endangerment that the State is required to prove beyond a reasonable doubt. The "Pediatric Discharge Instructions" that Ms. Morrison signed shortly after the baby was born did not establish that Ms. Morrison knew, or should have known, that her actions involved a substantial risk of death. The document merely indicated that a "baby should be in an approved crib or bassinet"—not that a baby must never sleep in a bed with a parent and the document did not mention drinking alcohol let alone a risk of death. Simply stating that it is common knowledge that co-sleeping with a baby after consuming alcohol to the point of serious impairment creates a risk of death for the baby does not alleviate the State of the burden of proving the existence of the risk and that an ordinarily prudent person would be aware of the risk, or for that matter of proving any of the other elements of the offenses or that Ms. Morrison was impaired.

Ms. Morrison's statements to Sergeant Wilson—namely, "I got drunk. I killed my baby"—did not establish directly or by inference that she was impaired or guilty of involuntary manslaughter or reckless endangerment. Although Ms. Morrison said that she got drunk, the fact remains that the State was required to prove all of the elements of grossly negligent conduct, and the State did not do so. Ms. Morrison's statement that she killed her baby was, at worst, an acknowledgement that her baby died while Ms. Morrison co-slept with her. Ms. Morrison's statement was not, in any way, an admission that her conduct rose to the level of reckless endangerment or gross negligence. It is important to note that Ms. Morrison made the statement to Sergeant Wilson on the very morning that she discovered her baby's body in her bed. According to Sergeant Wilson, when he spoke to her, Ms. Morrison had a "blank stare" and "looked like she was in shock." Even viewing

- 14 -

the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the State, Sergeant Wilson's testimony makes clear that Ms. Morrison's statement was motivated by shock caused by her four-month-old daughter's recent and sudden death. It is not possible to infer the elements of involuntary manslaughter and reckless endangerment from Ms. Morrison's, a grieving mother's, remarks.[4]

To be sure, Detective Jones testified that Ms. Morrison did not know what happened after she began drinking and when she woke up. A review of the trial transcript reveals that this was Detective Jones's assessment and the detective did not testify that Ms. Morrison told him that she did not know what happened. The detective testified: "She doesn't know what happened after that." A review of Ms. Morrison's testimony reveals that she testified about events that happened after she began drinking. Ms. Morrison testified in detail that she recalled her daughter waking her to tell her that her father had called, that she telephoned her daughter's father back, that she pretended to be asleep to help her daughter get back to sleep, and that she put her arm over her baby to prevent the baby from waking. The jury was not required to credit either Ms. Morrison's or the detective's testimony and taking the evidence in the light most favorable to the State, it was merely the detective's assessment that Ms. Morrison did not know what happened after she began drinking. Even if that testimony were believed it would be mere conjecture to conclude that Ms. Morrison's failure to remember was due to her being seriously impaired

---

[4]The same could be said of Ms. Morrison's testimony that she recalled telling Sergeant Wilson, "No matter what, it's my fault. I couldn't save her[.]" Plainly, this does not rise to the level of a confession satisfying the elements of involuntary manslaughter and reckless endangerment.

by alcohol rather than due to the discovery of her baby's death.

Were the Court to hold that the evidence was sufficient to support Ms. Morrison's convictions for involuntary manslaughter and reckless endangerment, we would blur the line between conduct constituting criminal gross negligence and the practice of a parent co-sleeping with a child, which without more everyone would agree would not result in a conviction for manslaughter should the child's accidental death occur. We would be naïve to think that parents do not drink alcohol—wine, beer, or a cocktail—and on occasion co-sleep with a baby. If all that were required to be proven to establish the elements of involuntary manslaughter and reckless endangerment is that a parent consumed alcohol and co-slept with a baby, resulting in the baby's death, the Court would be alleviating the State of the burden of proving the elements of the offenses, and creating strict liability. By way of analogy, should a parent use a sleeping aid, *e.g.*, a prescription or over-the-counter sleeping pill, and co-sleep with a baby and sleep soundly, resulting in the baby's death, under the State's theory this would be evidence sufficient for the parent to be found guilty of involuntary manslaughter. In its amicus brief, The Women's Law Center of Maryland, Inc. makes the point that women, *i.e.*, mothers, have traditionally been prosecuted more frequently or consistently for crimes involving child abuse and failing to protect children as opposed to men, and in particular that judgments concerning co-sleeping "are intertwined with questions of gender, race, and class." From my perspective, affirming the conviction in this case would potentially have a disparate effect on women in general, and indeed women of color and women of limited socioeconomic means. Certainly, anyone who co-slept with a baby under circumstances similar to those in this case would be at risk

for conviction on insufficient evidence in any jurisdiction in the State. The evidence here failed to establish that Ms. Morrison or an ordinarily prudent person would have been aware of the risk, and that Ms. Morrison consciously disregarded the risk and was indifferent to her baby's life. Even the medical examiner concluded after reviewing the investigative report that Ms. Morrison's baby's death was an accidental death. In sum, while the evidence was sufficient to establish that Ms. Morrison drank beer and co-slept with her baby, the evidence was woefully insufficient to support Ms. Morrison's convictions for involuntary manslaughter and reckless endangerment.[5]

For the above reasons, respectfully, I concur.

Chief Judge Barbera and Judge Booth have authorized me to state that they join in this opinion.

---

[5]I agree that Ms. Morrison's conviction for child neglect, which the Court of Special Appeals affirmed, will stand because no issue as to that conviction is before this Court.

IN THE COURT OF APPEALS

OF MARYLAND

No. 56

September Term, 2019
_____

STATE OF MARYLAND

v.

MURIEL MORRISON
_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.
_____

Dissenting Opinion by Biran, J.,
which McDonald and Getty, JJ., join
_____

Filed: July 28, 2020

Viewing the evidence presented at the trial in this tragic case in the light most favorable to the State, I believe that a rational juror could have found beyond a reasonable doubt that Ms. Morrison was grossly negligent and, therefore, guilty of involuntary manslaughter and reckless endangerment. Accordingly, I respectfully dissent from the Majority's decision to overturn the jury's verdict.

I begin with a point of agreement with the Majority: I do not believe that co-sleeping with an infant is inherently dangerous. As the Majority notes, there was evidence at trial that the safest way for a baby to sleep is alone in a crib or bassinet. The American Academy of Pediatrics recommends that "[i]nfants should sleep in the parents' room, close to the parents' bed but on a separate surface (room sharing)." *Safe Sleep: Recommendations*, https://www.aap.org/en-us/advocacy-and-policy/aap-health-initiatives/safe-sleep/Pages/Safe-Sleep-Recommendations.aspx (accessed on July 20, 2020), archived at https://perma.cc/92LY-7L7B. However, while it may be advisable to refrain from co-sleeping with an infant, it does not follow that co-sleeping is so unsafe as to render it inherently dangerous. As the Majority observes, a CDC study showed that 61.4 percent of surveyed mothers reported bed-sharing with their infants. I doubt that such a large percentage of mothers would engage in co-sleeping if it were an inherently dangerous practice.

I also do not believe, in general, that it is inherently dangerous for the sole caregiver of an infant to put the child to bed and then consume alcohol to the point of serious impairment. To be sure, it is not advisable for a parent to drink to excess at home if there is no other caregiver present to handle a dangerous situation that might arise involving a

child who is too young or otherwise unable to avoid the danger on his or her own. However, while it may be negligent for a sole caregiver to drink to the point of serious impairment in his or her home after young children have gone to bed for the night, I am not prepared to say that the caregiver is *grossly* negligent when he or she does so, in the absence of other circumstances that increase the likelihood of a specific danger arising.

However, a parent's combination of these non-inherently dangerous actions – drinking to the point of serious impairment in one's home and then co-sleeping with an infant – creates a substantial risk that the parent will suffocate the infant. *See* Jeanine Young and Rebecca Shipstone, *Shared Sleeping Surfaces and Dangerous Sleeping Environments*, *in* SIDS: SUDDEN INFANT AND EARLY CHILDHOOD DEATH, https://www.ncbi. nlm.nih.gov/books/NBK513372 (2018) (accessed on July 20, 2020), archived at https://perma.cc/2KQQ-88UG (explaining that "[u]nintentional suffocation is becoming increasingly recognized as a significant contributor to" Sudden Unexplained Death in Infancy ("SUDI") cases, and that "[t]he strongest predictor of SUDI has been identified as the combination of recent maternal alcohol consumption and sleeping together with an infant on a soft shared surface (bed or sofa)"). A finding of gross negligence in a case such as this one will turn on whether the parent "or an ordinarily prudent person under similar circumstances, should be conscious of this risk." *State v. Thomas*, 464 Md. 133, 167 (2019).

The Majority opines that, even if Ms. Morrison "drank enough beer to 'pass out,'" she is entitled to a judgment of acquittal because "there were no facts reflecting that Ms. Morrison knew that socially drinking at her own residence would create a substantial risk of harm to her children." Maj. Slip Op. at 29. Notably, the Majority does not refer to the

objective component of the standard in this part of its analysis. In my view, an "ordinarily prudent person" would know that parents who have consumed enough alcohol to be seriously impaired may be more difficult to rouse from sleep or, even if momentarily roused, may not recognize that they are a threat to their infants and fall back asleep. Thus, while 61 percent of mothers may conclude that co-sleeping is reasonably safe because they assume they will be able to hear their infants crying next to them if they begin to cause them any distress, I suspect that a large majority of those same mothers would agree that it is inherently dangerous to co-sleep with an infant when a parent goes to bed seriously impaired by alcohol. After all, "we know by common knowledge that alcohol distorts perception, slows reaction, and impairs motor skills." *Warr v. JMGM Grp., LLC*, 433 Md. 170, 240 n.28 (2013) (Adkins, J., dissenting); *see also State v. Jenkins*, 872 A.2d 469, 476 (Conn. App. 2005) ("It is a matter of common knowledge that the excessive use of liquor or drugs impairs the perceptual, judgmental and volitional faculties of the user.").

It is undisputed that the trial judge properly instructed the jurors on what they needed to find in order to conclude that Ms. Morrison was grossly negligent. It is also undisputed that Ms. Morrison co-slept with I.M. on September 2, 2013, and that Ms. Morrison unintentionally asphyxiated I.M. at some point before 8:30 a.m. that morning. Further, it is undisputed that Ms. Morrison consumed alcohol on the night of September 1-2, prior to co-sleeping with I.M. In my view, if the jury could have found that Ms. Morrison consumed enough alcohol to be seriously impaired when she co-slept with I.M., the jury also necessarily could have found that she was creating a risk of which an ordinarily prudent person would have been aware. Thus, the only point materially in dispute on appeal is the

sufficiency of the evidence that Ms. Morrison drank alcohol to the point of serious impairment before getting in bed with I.M. (and I.M.'s four-year-old sister) and falling asleep.

The standard of review is key to the proper resolution of this case. *See State v. Mayers*, 417 Md. 449, 466 (2010) ("[A]ny discussion of evidentiary sufficiency must be placed in the context of the standard of review."). Our mandate is to "examine the record solely to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cleaned up). When we conduct this inquiry, "[i]t is not our role to retry the case." *Smith v. State*, 415 Md. 174, 185 (2010). To the contrary, "[b]ecause the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Id.* "We do not second-guess the jury's determination where there are competing rational inferences available." *Id.* at 183. Thus, "[w]e defer to any possible reasonable inferences the jury could have drawn from the admitted evidence and need not decide whether the jury could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence." *Mayers*, 417 Md. at 466; *see also State v. Albrecht*, 336 Md. 475, 478 (1994) ("[I]t is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case.").

This standard of review regarding evidentiary sufficiency does not change when we are called upon to review a jury determination of gross negligence. "Whether or not gross

negligence exists necessarily depends on the facts and circumstances in each case. It is usually a question for the jury and is a question of law only when reasonable [people] could not differ as to the rational conclusion to be reached." *Rodriguez v. State*, 218 Md. App. 573, 598-99 (2014) (quoting *Romanesk v. Rose*, 248 Md. 420, 428 (1968)), *aff'd sub nom. Cooper v. Rodriguez*, 443 Md. 680 (2015). "[U]nless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Taylor v. Harford Cty. Dep't of Soc. Servs.*, 384 Md. 213, 229 (2004); *see also Stracke v. Estate of Butler*, 465 Md. 407, 420 (2019) (if "reasonable minds might differ" whether evidence makes out gross negligence, then the trier of fact's finding of gross negligence should not be disturbed).

As applied to this case, the standard of review requires us to ask if any rational juror could have determined beyond a reasonable doubt that Ms. Morrison consumed alcohol to the point of serious impairment before co-sleeping with I.M. on September 2, 2013. If the answer to that question is yes, then the evidence was sufficient for the jury to convict Ms. Morrison of involuntary manslaughter and reckless endangerment and we must affirm the jury's verdict.

In my view, there was sufficient evidence for a rational juror to conclude beyond a reasonable doubt that Ms. Morrison drank alcohol to the point of serious impairment before getting in bed with I.M. (and her four-year-old daughter). First and foremost was Ms. Morrison's admission to Sergeant Wilson very shortly after police arrived at Ms. Morrison's home and found I.M. unresponsive. Sergeant Wilson testified that Ms. Morrison told him she "got drunk and killed [her] baby." Ms. Morrison suggests that the

- 5 -

jury could have viewed this statement as the "hyperbolic exclamation of a mother experiencing the shock, grief, and guilt of her baby dying." Maybe so. But the jury was not required to interpret Ms. Morrison's statement that way. Rather, the jury could have reasonably concluded from Ms. Morrison's statement to Sergeant Wilson that she had felt seriously impaired by alcohol when she got into bed with I.M., and that she believed her inability to avoid the tragedy was due to her self-induced impairment. In my view, this admission, in and of itself, was sufficient to allow a rational juror to conclude that Ms. Morrison was, in fact, seriously impaired by alcohol while she co-slept with I.M.

But there was more. Also significant was Detective Jones's testimony that Ms. Morrison told him she had "laid her children down between … 10 p.m. and 12 a.m., and then she began to drink. *She doesn't know what happened after that.*" (Emphasis added.) The jury reasonably could conclude from this testimony that Ms. Morrison told Detective Jones she did not know what happened after she began to drink, and that Ms. Morrison did not know what happened because she drank to the point of serious impairment.

Still, there was more. A rational juror could have determined that the four-year-old's testimony was additional evidence that Ms. Morrison was seriously impaired because it established that Ms. Morrison: (1) did not respond to the four-year-old's yelling, "Mom, you're on my baby sister"; (2) did not hear her cell phone ringing on the bed; (3) failed to wake up when the four-year-old attempted to rouse her when the cell phone rang; (4) did not wake up after the four-year-old "threw stuff" at her; and (5) after waking up briefly out of her "deep, deep sleep," told the four-year-old that I.M. was okay but continued to lay on I.M. A rational juror could conclude that the logical explanation for the four-year-old's

- 6 -

observations – combined with Ms. Morrison's admissions that she drank alcohol that night and, in fact, "got drunk" – is that Ms. Morrison had consumed alcohol to the point of serious impairment.

The Majority and our concurring colleague note that Ms. Morrison testified at trial about many details of the night of September 1-2 from the time she started participating in the virtual "mom[s'] night out." She claimed that she consumed two 12-ounce beers and approximately half of a 40-ounce bottle of malt liquor on her porch as she socialized on Facebook with her friends in Virginia. She further testified that she waited until 2:30 a.m. for the children's father to arrive, and that, when he did not appear, she went inside. According to Ms. Morrison, she then pumped breastmilk, changed I.M.'s diaper, took out the trash, locked the doors, turned off the movie that the four-year-old had been watching, turned the television to PBS, got on Facebook again, and went to bed.

The Majority seemingly credits all of Ms. Morrison's trial testimony, but the jury was not required to do the same. And it is the jury's assessment of Ms. Morrison's credibility, not the Majority's, or our concurring colleague's, or mine that counts. The trier of fact "possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony." *Grimm v. State*, 447 Md. 482, 505 (2016) (internal quotation marks and citation omitted). For this reason, the jury "decides which evidence to accept and which to reject." *Id.* (internal quotation marks and citation omitted). In their assessment of the credibility of witnesses, jurors are "entitled to accept – or reject – *all*, *part*, or *none* of the testimony of any witness, whether that testimony was or was not contradicted or corroborated by any other evidence."

*Omayaka v. Omayaka*, 417 Md. 643, 659 (2011); *Grimm*, 447 Md. at 506 (same). Thus, a rational juror could have rejected those details in Ms. Morrison's trial testimony that tended to portray her as not seriously impaired, and instead credited Ms. Morrison's statements to Sergeant Wilson and Detective Jones that she had gotten drunk and that she did not remember what happened after she began drinking.

In particular, the jurors were not required to credit Ms. Morrison's testimony that she drank two 12-ounce beers and about half of a 40-ounce bottle of malt liquor. Rather, based on the four-year-old's observations of her mother, a rational juror could have concluded that Ms. Morrison likely understated the amount of alcohol she had consumed. Alternatively, if the jurors believed Ms. Morrison's account of the quantity of alcohol she consumed, they nevertheless could have concluded that this amount – which included a substantial amount of malt liquor – was sufficient to seriously impair her.[1] In this regard, the jury could have found pertinent that Ms. Morrison told Ms. Townsend, the clinical

---

[1] A typical malt liquor contains approximately seven percent alcohol by volume ("ABV"). *See* https://www.alcohol.org/statistics-information/abv (accessed on July 22, 2020), archived at https://perma.cc/ZAZ8-VWMV. The average beer ABV is five percent. *Id.* According to the Beeradvocate website, Private Stock Malt Liquor contained 6.9 percent ABV. *See* Haffenreffer Private Stock, https://www.beeradvocate.com/beer/profile/24964/669 (accessed on July 22, 2020), archived at https://perma.cc/K349-NXKQ. A 40-ounce bottle of malt liquor containing seven percent ABV is the equivalent of 4.7 U.S. standard drinks. *See* https://www.rethinkingdrinking.niaaa.nih.gov/tools/calculators/drink-size-calculator.aspx (accessed on July 22, 2020), archived at https://perma.cc/3W7E-NUXA. Thus, if Ms. Morrison drank a little more than half of a 40-ounce bottle of Private Stock Malt Liquor, as well as two 12-ounce beers, she had the equivalent of more than 4 U.S. standard drinks. However, as stated above, the jurors reasonably could have concluded that Ms. Morrison drank more alcohol than she claimed.

social worker at the hospital, that she had not consumed alcohol for some time prior to September 2. In addition, Ms. Morrison herself testified that, except for having had a "couple of beers," everything else about the night of I.M.'s death "was routine." Applying their common sense, the jurors reasonably could have inferred from these remarks that Ms. Morrison was not a regular drinker and that she may have had a low tolerance for alcohol on the night of September 1-2.

The Majority also ascribes importance to Sergeant Wilson's and Detective Jones's testimony that Ms. Morrison did not seem impaired when they spoke with her on the morning of September 2. However, by the time those officers interacted with Ms. Morrison, even by her own account, it had been more than six hours since she stopped drinking. There was no conclusive evidence submitted to the jury of the time of I.M.'s death. According to Ms. Townsend, Ms. Morrison told her that I.M.'s body was cold when Ms. Morrison woke up. Thus, the jury reasonably could have concluded that the asphyxiation occurred several hours prior to Sergeant Wilson's arrival at the home at approximately 8:30 a.m. In addition, a rational juror could have concluded that the shocking realization that Ms. Morrison had suffocated her infant caused Ms. Morrison to present more soberly to Sergeant Wilson and Detective Jones than she otherwise would have if she had not awakened to this tragedy. Either of these inferences would have been reasonable. In any event, the jury was not required to disregard Ms. Morrison's admission that she "got drunk" on the night of September 1-2 because she appeared to be sober by 8:30 a.m. on September 2. It was the jurors' role to sort through all the evidence, some of it conflicting, and draw the inferences from the evidence that they believed made sense. The jurors did that here.

This was a closer case for a finding of gross negligence than *State v. Thomas* and the out-of-state cases the Majority cites. *See* Maj. Slip Op. at 29-34. But it does not follow that, in this case, the State failed to present sufficient evidence to permit a rational juror to find that Ms. Morrison was grossly negligent. Much hinged on the jurors' sifting of Ms. Morrison's various statements and on their assessment of the credibility of the one other eyewitness to some of the events in question, who was four years old at the time and seven years old when she testified. Perhaps one or more of the judges of this Court would have voted to acquit if we had been on this jury. But whether we would have acquitted or convicted Ms. Morrison, had we been jurors, is not the question we must ask in resolving this appeal. A properly instructed jury of Ms. Morrison's peers in Baltimore City found that she was grossly negligent and, accordingly, convicted her of involuntary manslaughter and reckless endangerment. Thus, the question before us as an appellate court is whether we believe, *viewing the evidence in the light most favorable to the State,* that *any rational juror* could have voted to convict Ms. Morrison of these charges.

The italicized phrases in the preceding sentence are not empty words. They compel us to refrain from substituting our preferred inferences for the inferences the jurors actually drew in this case. They compel us to refrain from discrediting a seven-year-old witness whom the jurors chose to believe. And they compel us to resolve all conflicts in the evidence in favor of the State. When we follow these dictates of appellate review in this case, I believe we are constrained to conclude that a rational juror could have found that Ms. Morrison went to bed seriously impaired by alcohol and that she therefore was grossly negligent by not sleeping somewhere other than next to I.M. that night. For this reason, I

would reverse the Court of Special Appeals and reinstate Ms. Morrison's convictions for involuntary manslaughter and reckless endangerment.

Judge McDonald and Judge Getty have authorized me to state that they join this opinion.